IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NASSER ALMUTAIRI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHAIRMAN, BROADCASTING BOARD OF | ) | CIVIL ACTION NO. RWT-06-1929 |
| GOVERNORS, | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

**<u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND IN RESPONSE TO MOTION TO TRANSFER VENUE</u>**

William R. Stein (Bar No. 10570)
Daniel James McLaughlin (Bar No. 17851)
1775 I Street, NW
Washington, DC 20006
(202) 721 - 4600 (Tel)
(202) 721 - 4646 (Fax)

Attorneys for Plaintiff

# <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ........................................................................................................1

**STATEMENT OF FACTS** ..............................................................................................................2

    A.  During 2002 To 2004 The Agency Was Seeking To Hire Numerous Experienced Arabic Language Radio Broadcasters, A Position For Which Mr. Almutairi Was Well Qualified. ............................3

    B.  Mr. Almutairi Is A Dark-Skinned Yemeni With A Disability. ..........................................................4

    C.  The Agency Repeatedly Rejected Mr. Almutairi's Applications For Employment With Radio Sawa. ..............................................................................................................................................5

        1.  The June 2003 Application: Mr. Almutairi received a conditional offer pending receipt of a security clearance. ......................................................................................................................5

        2.  The June 2003 Application: Mr. Almutairi received his clearance, but the Agency strung him along and gave him shifting excuses. ......................................................................................6

        3.  The October 2003 and December 2004 Applications: Mr. Almutairi submitted back-up applications, which the Agency promptly rejected for inconsistent reasons. ...............................7

        4.  The June 2003 Application: The Agency finally rejected Mr. Almutairi and changed its story about why. ......................................................................................................................................8

        5.  The March 2004 Application: Mr. Almutairi applied again and was rejected on a demonstrably pretextual basis. ................................................................................................................................9

    D.  Mr. Almutairi Initiated The Administrative Process For Submitting A Complaint Soon After Learning The Agency Had Rejected His June 2003 Application. ....................................................10

    E.  A Pro-Lebanese Bias Pervaded All Aspects Of The Agency's Hiring Practices. ...........................12

**ARGUMENT** ................................................................................................................................14

I.       PLAINTIFF'S CLAIMS BASED ON REJECTION OF HIS JUNE 2003 APPLICATION ARE PROPERLY BEFORE THE COURT. ...............................................................................................16

    A.  Mr. Almutairi Applied In June 2003 For A GS-12 IRB Position, And He Presented Claims Relating To That Application To The EEOC, Which Investigated Them. ......................................16

        1.  Mr. Almutairi submitted a formal complaint to the EEOC regarding his June 2003 Application. ......................................................................................................................................17

        2.  Mr. Almutairi applied in June 2003 for a GS-12 IRB position. ..................................................19

    B.  Plaintiff Timely Exhausted His Administrative Remedies. ............................................................22

II.     PLAINTIFF HAS ADEQUATELY ALLEGED CLAIMS OF EMPLOYMENT
DISCRIMINATION. .................................................................................................26

III.    THE AGENCY'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED. ...........28

   A. Mr. Almutairi Has Adequately Established His Disability. ............................................30

      1.  Mr. Almutairi has alleged—and the evidence supports—that he is substantially limited in a
          major life activity. ....................................................................................................31

      2.  The Agency regarded Mr. Almutairi as disabled. ....................................................32

      3.  The Agency has not met its burden of showing the absence of supporting evidence or genuine
          issues of material fact. ............................................................................................ 33

   B. Genuine Issues Of Material Fact Exist Whether The Agency's Rejection of Mr. Almutairi's
      Application Under Consideration Give Rise To An Inference of Unlawful Discrimination On The
      Basis Of National Origin Or Color. .............................................................................34

   C. Genuine Issues Of Material Fact Exist As To Whether The Agency's Proffered "Legitimate,
      Nondiscriminatory" Reason For Rejecting Mr. Almutairi Was Pretextual. ...................37

   D. Alternatively, Mr. Almutairi Should Be Given An Opportunity To Conduct Discovery Before The
      Court Addresses The Agency's Motion For Summary Judgment. ..................................45

IV.    TRANSFER OF VENUE TO THE DISTRICT OF COLUMBIA WOULD ONLY ENGENDER
FURTHER DELAY. .................................................................................................48

**CONCLUSION** ..................................................................................................48

Plaintiff Nasser Almutairi respectfully submits this memorandum in opposition to the Motion To Dismiss Or, In The Alternative, For Summary Judgment Or To Transfer Venue filed by Defendant Chairman, Broadcasting Board of Governors (the "Agency").  The Agency has moved under Rule 12(b)(1) to dismiss certain aspects of Plaintiff's claims as jurisdictionally defective,[1] and under Rule 56 for summary judgment on other claims on the basis of material outside the complaint (a four-page affidavit from an Agency official and internal documents submitted by the Agency during the EEOC investigation).  There has been no disclosure or discovery in this case.  The Agency's motion is procedurally confused, premature, and substantively meritless.

## PRELIMINARY STATEMENT

By narrowly focusing on specific vacancy announcements—and then misapplying jurisdictional rules to limit review—the Agency attempts to gloss over the true gravamen of Mr. Almutairi's complaint and minimize his long struggle against the Agency's discriminatory hiring practices at Radio Sawa.  As shown below, Mr. Almutairi applied for a permanent broadcasting position at Radio Sawa in June 2003 and was finally rejected for that position by Radio Sawa in March 2004.  Within a few days of that adverse employment action, he initiated the administrative complaint process with the Agency's Civil Rights Office, alleging discrimination on the basis of color, national origin, and disability, and then exhausted his administrative remedies before the EEOC.  This Court, therefore, unquestionably has jurisdiction to hear that claim, and the Agency has made no argument that the June

---

[1] Although the Agency asserts in its motion that it is moving under Rule 12(b)(6), and it discusses the standards for a Rule 12(b)(6) motion, a review of its supporting memorandum reveals that, in fact, the Agency (i) moves under 12(b)(1) to dismiss Mr. Almutairi's claims based on four of his five employment applications as beyond the Court's jurisdiction, and (ii) moves for summary judgment under Rule 56 as to Mr. Almutairi's claims based on his fifth application.  The Agency makes no argument that any of Mr. Almutairi's claims should be dismissed on the merits under Rule 12(b)(6).

2003 application claim is defective on its face under Rule 12(b)(6), or subject to summary judgment under Rule 56.

Mr. Almutairi applied for another broadcasting vacancy at Radio Sawa in March 2004, and was formally rejected shortly thereafter.  The Agency concedes that the Court has jurisdiction over Mr. Almutairi's claims based on the Agency's rejection of his March 2004 application.  The Agency contends, however, that it is entitled to summary judgment on those claims, based principally on the single purported "fact" that it hired a better-qualified, dark-skinned Sudanese woman instead of Mr. Almutairi for the broadcaster vacancy he was seeking.  But that "fact" *is demonstrably false*:  In another employment discrimination case against the Agency in which other applicants were alleging discrimination on the basis of national origin, the Agency asserted as a defense that it had hired the *same* dark-skinned Sudanese woman two years earlier as a Radio Sawa broadcaster in response to a *different* vacancy announcement.  In any event, Mr. Almutairi's qualifications were vastly superior.  The Agency also ignores the documented fact that its own employees have now changed their stories several times as to why the Agency has refused to hire Mr. Almutairi—a red flag for a pretextual justification.  Clearly, summary judgment is not warranted, particularly here, where no initial disclosures or other discovery has taken place.  The Court should deny the motion.  At a minimum, however, the Court should grant Mr. Almutairi the opportunity to conduct discovery before addressing the Agency's motion.

## STATEMENT OF FACTS

For purposes of responding to any Rule 12(b)(6) motion—to the extent one is being made—the statement of facts is based on the allegations in the Amended Complaint, the documents that

the Amended Complaint incorporates, references or relies on, and any publicly available material of which the Court may take judicial notice.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).   For purposes of responding to the Agency's summary judgment motion—and any Rule 12(b)(1) motion, although we do not believe that any of the Agency's arguments go to the Court's jurisdiction (*see* Section I, below)—the facts stated herein are based on (1) the Declaration of Nasser Almutairi ("Almutairi Decl."), which relates (with some elaboration) in evidentiary form certain relevant facts alleged in the Amended Complaint, and the exhibits thereto (2) the Declaration of Daniel James McLaughlin ("McLaughlin Decl."), which authenticates certain documents and provides information as required by Rule 56(f), and (3) documents referenced in the Amended Complaint or the Agency's papers.

     A.     **<u>During 2002 To 2004 The Agency Was Seeking To Hire Numerous Experienced Arabic Language Radio Broadcasters, A Position For Which Mr. Almutairi Was Well Qualified.</u>**

In the years immediately following the 9/11 attacks, the Agency was trying to expand its Arabic language broadcasting services, and thus was seeking to hire numerous qualified individuals to serve as GS-12 level Arabic International Radio Broadcasters ("IRBs") at the newly formed Radio Sawa, an Arabic-language radio service that the Agency operated.  (*See* Am. Compl. ¶¶ 11, 24, 27, 29; McLaughlin Decl. Ex. 2 [U.S. State Department, Office of Inspector General, *Review of the Broadcasting Board of Governors' Middle East Radio Network Launch and Broadcast Initiatives*, No. IBO-A-04-12 (Draft Nov. 2004)] at 3-5; Def.'s Br. Ex. 1 [Vacancy Announcement M/P-03-02].)  As its vacancy announcements indicate, the Agency sought individuals who possessed (i) extensive knowledge of the Middle East's history and culture, as well as an awareness of its political, economic, and social development, (ii) thorough knowledge of broadcast journalism required for writing articles and

conducting interviews, (iii) familiarity with computers, and (iv) previous experience with leading news organizations, among other things.  (*See, e.g.,* Def.'s Br. Ex. 1 at 3-4.)  In testimony before Congress, Mouafac Harb, the previous Director of Radio Sawa, explained that finding qualified broadcasters within a short period of time was "not an easy task to do," in part because the number of highly-skilled, experienced Arabic-speaking journalists in the United States "is extremely small." (McLaughlin Decl. Ex. 1 [*Broadcasting Board of Governors and AlHurra Television: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Int'l Relations ("Subcomm. Hearing")*, 109th Cong. (2005)] at 54, 55.)

It is undisputed that Nasser Almutairi had the knowledge, skills, and abilities necessary for the GS-12 IRB position at Radio Sawa.  (*See* Def.'s Br. 14 (conceding that Mr. Almutairi "was qualified for the [IRB] position").)  He is an experienced journalist, fluent in English and Arabic (both Modern Standard Arabic and the "street" dialects of various Middle Eastern countries), and is able to communicate effectively in both languages.  (Am. Compl. ¶¶ 7-9; Almutairi Decl. ¶ 5; Almutairi Decl. Ex. 19 [Resume of Mr. Almutairi].)  He is well versed in the politics and the culture of the Middle East, and he has many years of experience reporting on such issues as a journalist for a number of Middle Eastern and Western news agencies, including the BBC and Al-Jazeera.   (Am. Compl. ¶ 9; Almutairi Decl. ¶ 6.)  Mr. Almutairi obtained bachelor's and master's degrees in journalism, and is experienced with computers and standard software such as Microsoft Word.  (Am. Compl. ¶ 7; Almutairi Decl. ¶ 4.)

**B.    Mr. Almutairi Is A Dark-Skinned Yemeni With A Disability.**

Mr. Almutairi is a dark-skinned, Yemeni-born U.S. citizen, having immigrated from Yemen to this country over fifteen years ago.  (Am. Compl. ¶ 2; Almutairi Decl. ¶ 1.)  Additionally, at the time he was seeking employment at Radio Sawa and continually to the present, Mr. Almutairi has

suffered from a disability resulting from an automobile accident in 1997 in which he sustained serious injuries, including to his back, hip, leg, and ankle. (Am. Compl. ¶ 3; Almutairi Decl. ¶¶ 2-3.) That injury resulted in ongoing serious leg pain, and Mr. Almutairi has since walked with a pronounced limp, requiring a leg brace and a cane or other support to stand or walk. At the time he interviewed for the positions at issue, he could only walk a few steps without assistance. (Am. Compl. ¶ 3; Almutairi Decl. ¶¶ 2-3.)

### C. The Agency Repeatedly Rejected Mr. Almutairi's Applications For Employment With Radio Sawa.

When Mr. Almutairi learned that the Agency was looking for IRBs to expand its Arabic-language radio service, he concluded that his qualifications met perfectly the job requirements. He also saw it as an opportunity to serve his new country. Thus, he applied for the job. In fact, during 2003-04, Mr. Almutairi repeatedly sought employment at Radio Sawa, submitting at least five applications for GS-12 IRB vacancies. (*See* Am. Compl. ¶¶ 11, 24, 27, 29; Almutairi Decl. ¶¶ 7, 15, 18) But although Mr. Almutairi was undisputedly qualified to work as an IRB, and although the Agency desperately needed IRBs with Mr. Almutairi's background and experience between 2003 and 2004, the Agency repeatedly rejected his applications for employment. (*See* Am. Compl. ¶¶ 20, 25, 26, 28, 30, 31; Almutairi Decl. ¶¶ 15, 16, 18.)

1. *The June 2003 Application: Mr. Almutairi received a conditional offer pending receipt of a security clearance.*

Mr. Almutairi first applied for a GS-12 IRB position at Radio Sawa in June 2003 under Vacancy Announcement M/P-03-02, which was an open-ended vacancy announcement indicating that there were "multiple positions" available (the "June 2003 Application"). (Am. Compl. ¶ 11; Almutairi Decl. ¶ 7; Def. Br. Ex. 1.) Shortly after submitting his application, he received a telephone call asking

him to set up an interview appointment.  Because Mr. Harb (Radio Sawa's then-director) and Daniel

Nassif, then-managing editor of Radio Sawa, were out of town, Mr. Almutairi scheduled an interview

with Munir Nasser, then-supervisor of Radio Sawa's IRB Internet Unit.  (Am. Compl. ¶ 11; Almutairi

Decl. ¶ 7.)  On June 12, 2003, Mr. Nasser interviewed Mr. Almutairi and, on that very day, extended

him a conditional offer of employment pending the approval of his required security clearance.  (Am.

Compl. ¶ 12; Almutairi Decl. ¶ 8.)  As instructed, Mr. Almutairi proceeded to submit his application for

a security clearance.  (Am. Compl. ¶ 13; Almutairi Decl. ¶ 9.)

Shortly thereafter, Mr. Nasser told Mr. Almutairi to return to Radio Sawa for an

orientation session.  During that subsequent orientation session, Mr. Nasser introduced Mr. Almutairi to

as many as thirty of Radio Sawa's newsroom staff as someone who would soon join their ranks, and

even showed Mr. Almutairi the desk and computer where he would be working.  (Am. Compl. ¶ 14;

Almutairi Decl. ¶ 10.)  Mr. Nasser stressed that Mr. Almutairi should be ready to start immediately upon

receipt of his security clearance.  (Am. Compl. ¶ 14; Almutairi Decl. ¶ 10.)  As part of that orientation,

Mr. Almutairi was introduced to Radio Sawa's managing editor, Mr. Nassif.  (Am. Compl. ¶¶ 11, 15;

Almutairi Decl. ¶ 11.)  Immediately after that introduction, Mr. Almutairi overheard Mr. Nassif remark,

"We don't need more people with disabilities here."  (Am. Compl. ¶ 15; Almutairi Decl. ¶ 11.)

> 2.    *The June 2003 Application: Mr. Almutairi received his clearance, but the Agency*
> *strung him along and gave him shifting excuses.*

Mr. Almutairi later learned from the security officer who had interviewed him during the

security clearance process that his security clearance had been approved and forwarded to Radio Sawa

around July 8, 2003.  (Am. Compl. ¶ 17; Almutairi Decl. ¶ 13.)  On August 27, 3003, Mr. Almutairi

contacted Mr. Nasser to ask why he had not been asked to start yet.  (Am. Compl. ¶ 17, 18; Almutairi

Decl. ¶ 13.)  Mr. Nasser first told Mr. Almutairi that there had been an issue with Mr. Almutairi's

security clearance, but when Mr. Almutairi clarified that the security clearance had in fact been

approved, Mr. Nasser came up with another reason, stating instead that the Agency's management had a

"reservation" about hiring him.  (Am. Compl. ¶ 18; Almutairi Decl. ¶ 13.)  Mr. Nasser assured Mr.

Almutairi, though, that he would get back in touch with Mr. Almutairi once that issue had been resolved.

(Am. Compl. ¶ 18; Almutairi Decl. ¶ 13.)  Mr. Almutairi made a number of attempts to contact Mr. Harb

and his secretary to set up a meeting to discuss and resolve any "reservations" directly, but they declined

to speak with him.  (Am. Compl. ¶ 19; Almutairi Decl. ¶ 14.)

> 3.     *The October 2003 and December 2004 Applications: Mr. Almutairi submitted back-up applications, which the Agency promptly rejected for inconsistent reasons.*

While waiting to hear back from Mr. Nasser, and while attempting to contact Radio Sawa

management himself to help resolve this "reservation," Mr. Almutairi submitted three additional "back-

up" applications for other GS-12 IRB vacancies at Radio Sawa, all of which were rejected.  (Am.

Compl. ¶¶ 19, 24, 27; Almutairi Decl. ¶ 15.)  He applied on October 9, 2003 in response to Vacancy

Announcement M/P-03-02.  (As noted, Vacancy Announcement M/P-03-02 was an open-ended

announcement for multiple positions.)  On October 24, 2003, the Agency sent him a letter, signed by

Susan King, then-Human Resources Specialist with the Agency, denying employment on the ground

that his application had not addressed the required "Knowledge, Skills and Abilities," even though the

October Application did address those topics, as required (*see* Def.'s Br. Ex. 2 [Mr. Almutairi's October

9, 2003 Application] (noting his strong background in media and broadcasting, his knowledge of

political and economic issues in the region, his technical skills and knowledge of computers, and

previous experience with major news organizations like the BBC)).

Also in October 2003, Mr. Almutairi submitted an application in response to Vacancy

Announcement M/P-03-177A, which had opened on September 16, 2003, and had sought applicants for a GS-12 IRB position. (Am. Compl. ¶ 25; Almutairi Decl. ¶ 15.) On October 24, 2003, the Agency sent him a letter, also signed by Ms. King, claiming that the vacancy in question had closed and that the position would not be filled, even though the Agency was still actively seeking GS-12 IRBs at that time. (Am. Compl. ¶ 26; *see* Almutairi Decl. Ex. 3 [Vacancy Announcement M/P-03-02 (posted November 18, 2003)].)

On December 24, 2003, Mr. Almutairi applied again under Vacancy Announcement M/P-03-02, which had been re-posted on November 18, 2004 on the Washington Post Jobs website. (Am. Compl. ¶ 28; Almutairi Decl. Ex. 3 (showing a posting date of "11/18/03").) He received a rejection letter from Ms. King dated January 2, 2004, asserting that the vacancy announcement had closed on October 22, 2003, nearly a month *before* the announcement had been re-posted on the Washington Post website. (Almutairi Decl. Ex. 6 [Letter from Ms. King to Mr. Almutairi (Jan. 2, 2004)].)

4.    *The June 2003 Application: The Agency finally rejected Mr. Almutairi and changed its story about why.*

In early March 2004, Mr. Nasser finally contacted Mr. Almutairi to inform him that the Agency would not hire him under his June 2003 Application. (Am. Compl. ¶ 20; Almutairi Decl. ¶ 16.) Mr. Nasser initially did not give a reason for the Agency's decision not to hire Mr. Almutairi. Mr. Almutairi pressed for an explanation, since he believed he had been offered the job. On March 17, 2004, Mr. Nasser left a voicemail on Mr. Almutairi's telephone answering machine stating that the Agency could not hire Mr. Almutairi because Mr. Almutairi's son also worked at Radio Sawa, and that the Agency's regulations prohibit two individuals from the same family from working at the same

place.[2]  (Am. Compl. ¶ 20; Almutairi Decl. ¶ 16; Almutairi Decl. Ex. 7 [Answering Machine Recording

(March 17, 2003)].)  In an interview with the EEO Counselor from the Agency's Office of Civil Rights

soon thereafter, Mr. Almutairi called the truth of that assertion into question—because he knew that

several other employees at Radio Sawa worked with family members.  (Am. Compl. ¶ 21; Almutairi

Decl. ¶ 17.)  In response, the Agency once again changed its story.  Mr. Nassif claimed to the EEO

Counselor in an interview that the Agency did not reject Mr. Almutairi "solely due to his son's

employment with their office . . . , [but also because] he felt it inappropriate to hire [Mr. Almutairi] as a

Purchase Order Vender (POV) and offer him $15 per hour, due to his experience and expertise."

(Almutairi Decl. Ex. 13 [Broadcasting Board of Governors, *EEO Counselor's Report* (June 4, 2004)] at

4.)  But Mr. Almutairi had never applied for a part-time contractor position ("POV" or otherwise).  (Am.

Compl. ¶ 22; Almutairi Decl. ¶¶ 7-8.)  In fact, as Mr. Nasser had previously told the EEO Counselor in

an interview on April 7, 2004, Mr. Nasser had interviewed Mr. Almutairi in June 2003 "for a full-time

position at the Middle East Radio Network Division." (Almutairi Decl. Ex. 13 at 3.)

     5.    *The March 2004 Application: Mr. Almutairi applied again and was rejected on a*
          *demonstrably pretextual basis.*

        Undeterred by this latest rejection, Mr. Almutairi submitted another application for a GS-

12 IRB vacancy at Radio Sawa on March 23, 2004 (the "March 2004 Application") under Vacancy

Announcement M/P-04-22, which the Agency had issued on March 10, 2004.  (Am. Compl. ¶ 29;

Almutairi Decl. ¶ 18.)  The Agency once again rejected Mr. Almutairi, informing him in a letter dated

March 25, 2004 that although he had been "among the best qualified applicants considered for the

position," another individual had been hired.  (*Id.*; Almutairi Decl. Ex. 8 [Letter from Ms. King to Mr.

---

[2] Mr. Almutairi's son, Alsamwal Almutairi, worked for Radio Sawa for a short period in a contracting
position as a website technician.  (Almutairi Decl. ¶ 16.)

Almutairi (March 25, 2004)].)  The Agency has maintained as its justification for failing to hire Mr.

Almutairi that it instead hired Zahrat Abuzaid, "a U.S. citizen of Sudanese origin with black skin," as its

preferred candidate to fill vacancy announcement M/P-04-22.  (Def.'s Br. 15.)

Even leaving aside the objective superiority of Mr. Almutairi's qualifications,[3] this

cannot be true.  As a defense to charges in *another* case that it discriminated on the basis of national

origin, religion, and age in failing to hire other applicants (of Egyptian and Syrian national origin) for

GS-12 IRB positions at Radio Sawa, the Agency has previously stated to the U.S. District Court for the

District of Columbia that Vacancy Announcement M/P-02-41 for "GS-12, International Radio

Broadcaster (Arabic) positions, opened on February 21, 2002 and closed on March 13, 2002," and the

"selectees for the GS-12 positions [included] . . . Zahrat Abuzaid."  (McLaughlin Decl. Ex. 7

[*Abdelkarim v. Tomlinson*, Civ. Action No. 05-1783 (EGS) (D.D.C.), Paper No. 41 (June 13, 2008)] at

14, 30-31.)  The Agency has not explained in this Court how the Agency could have selected Ms.

Abuzaid for a GS-12 IRB position at Radio Sawa in March 2004 under Vacancy Announcement M/P-

04-22 when it had already selected her for a GS-12 IRB position at Radio Sawa in March 2002 under

Vacancy Announcement M/P-02-41.

D.    **Mr. Almutairi Initiated The Administrative Process For Submitting A Complaint
Soon After Learning The Agency Had Rejected His June 2003 Application.**

On March 8, 2004, having just been informed that he would not be hired under his June

---

[3] At the time that he applied, Mr. Almutairi had at least eighteen years of journalism experience,
including with international news organizations and local television and radio stations in Yemen.  He
had vast experience living and working in the Middle East, and had served as a correspondent in that
region for the BBC, as well as a writer and contributor for *Al Jazeera* and *Al Arabia*.  He had authored
numerous articles on Middle East news, politics, business and culture for multiple newspapers, and he
held multiple degrees in journalism.  (Almutairi Decl. Ex. 19.)  Even on the most generous reading of
her resume, Ms. Abuzaid had less than ten years of journalism experience, most of which was as a
producer at Voice of America in Washington, D.C.  (Def.'s Br. Ex. 17.)

2003 Application, Mr. Almutairi initiated contact with an EEO Counselor.  (*See* Almutairi Decl. ¶ 16; Almutairi Decl. Ex. 9 [Broadcasting Board of Governors, Office of Civil Rights, *Initial Contact Sheet*] at 1.)  The EEO Counselor conducted an initial interview with Mr. Nasser on April 7, 2004, with Mr. Almutairi on April 8, 2004, and with Mr. Nassif and Ms. King shortly thereafter.  (*Id.* at 4.)  Mr. Almutairi sent letters to the EEO Counselor on April 1 and April 9, 2004, challenging the various explanations that the Agency officials had provided for rejecting him under his June 2003 Application, and—as his March 2004 Application had by then been rejected—providing new information relating to that later application.  (Almutairi Decl. Ex. 10; Almutairi Decl. Ex. 11.)  The EEO Counselor conducted her final interview with Mr. Almutairi on April 14, 2004 and provided him with a notice of final interview and a formal complaint form.  (Almutairi Decl. Ex. 9.)

On April 26, 2004, Mr. Almutairi submitted his formal administrative complaint.  (*See* Almutairi Decl. Ex. 12.)  The EEOC sent Mr. Almutairi a letter on April 27, 2004 acknowledging receipt of his complaint of employment discrimination.  On June 17, 2004, the EEOC informed Mr. Almutairi that it had "accepted the following claim for processing: Whether the Mr. Almutairi was discriminated against based on his race (Black), color (dark skin), national origin (non-Lebanese), and/or disability (leg injury), when he was not selected for the positions of International Radio Broadcaster (Arabic), GS-12, under vacancy announcements No. M/P-04-22 and M/P-03-02."  (Def.'s Br. Ex. 13; *see* Almutairi Decl. Ex. 14 [Broadcasting Board of Governors, *Report of Investigation* (Sept. 10, 2004)] at 2.)  (It bears repeating here: Mr. Almutairi's March 2004 Application was made under M/P-04-22 and his June 2003 Application was made under M/P-03-02.)  On June 18, 2004, an investigator, James S. Gee, was authorized to investigate the claims that the EEOC had accepted for processing.  (Almutairi Decl. Ex. 14 at 2.)  During that investigation, Mr. Gee obtained affidavits of Mr. Almutairi, Ms. King,

Mr. Nassif, and Mr. Nasser, as well as certain documents relating to the staff profile at Radio Sawa, applicants and selectees under the two relevant vacancy announcements, and Agency hiring guidelines. (*Id.* at 2-3.)

The investigation ended on September 10, 2004. (*Id.* at 2.) The EEOC issued its final decision declining to proceed on July 15, 2005, and following several administrative appeals, issued Mr. Almutairi a right-to-sue letter on May 31, 2006. On July 25, 2006, Mr. Almutairi commenced this action *pro se* in this Court.

### E.    A Pro-Lebanese Bias Pervaded All Aspects Of The Agency's Hiring Practices.

Mr. Almutairi's allegations about the Agency's discriminatory practices are not new. The Court may take judicial notice of the fact that around the time that the Agency rejected Mr. Almutairi, the State Department's Office of Inspector General ("OIG") conducted an investigation of Radio Sawa and issued a draft report, which stated that "OIG believes the Radio Sawa hiring process may have been marred by favoritism toward Lebanese candidates or candidates of Lebanese ancestry." (McLaughlin Decl. Ex. 2 at 54.) The OIG stated that there was a "lack of standard in hiring . . . broadcast employees," that there was a disproportionate presence of persons of Lebanese origin at Radio Sawa in Washington and the Agency's Middle East Programming Center in Dubai, and that there seemed to be "no strategy to accommodate other Arabic dialects" other than Lebanese in certain broadcasts. (*Id.* at 6, 54-55, 69.) Put differently, the draft report stated that there was a bias against hiring individuals not of Lebanese national origin.

In addition, Mr. Almutairi is not the first to assert claims against the Agency for discriminatory hiring practices. For example, in a lawsuit filed in 2005 in the U.S. District Court for the District of Columbia, five Egyptian and Syrian plaintiffs sued the Agency for employment

discrimination on the basis of national origin, religion, and age when they were denied GS-12 IRB and

GS-13 Supervisory IRB positions at Radio Sawa in 2002.  (*See* McLaughlin Decl. Ex. 6 [Complaint,

*Abdelkarim v. Tomlinson*, Civ. Action No. 05-1783 (EGS) (D.D.C. Sept. 8, 2005)].)  Those plaintiffs

alleged in particular that the Agency "gave preference to persons of Lebanese national origin for

selection to GS-12 International Radio Broadcaster positions with Radio Sawa."  [*Id.* at ¶ 22.]  The court

in that case denied the Agency's motion for summary judgment, noting that the case was "fraught with

genuine issues of material facts in dispute."  (McLaughlin Decl. Ex. 8 [*Abdelkarim v. Tomlinson*, 605 F.

Supp. 2d 116 (D.D.C. 2009).) [4]

      The pro-Lebanese bias of both Radio Sawa and its television counterpart, Al Hurra (also

operated by the Agency), has also attracted media attention.  One article, for example, noted a pro-

Lebanese hiring practice at Radio Sawa and Al Hurra in 2003 and 2004, stating that Director Harb

"filled the newsroom largely with inexperienced Christian Lebanese reporters hired in his native Beirut."

(McLaughlin Decl. Ex. 3 [Dafna Linzer, *Lost in Translation: Alhurra—America's Troubled Effort to

Win Middle East Hearts and Minds*, ProPublica (June 22, 2008)].)  Another article reported in 2005 that

"Independent observers say that the networks have been marred by an unprofessional, freewheeling

approach to hiring and firing, shoddy journalism, and distorted news priorities that usually downplay

tough coverage of Arab regimes and even terrorist organizations—while often overemphasizing news

from Lebanon, which happens to be [Mr.] Harb's homeland."  (McLaughlin Decl. Ex. 4 [Art Levine,

*Bad Reception*, The American Prospect (Nov. 7, 2005)].)  A book on Arabic media observed that Munir

Mawari—apparently the only Yemeni IRB at Radio Sawa in 2003 and 2004—complained that Mr.

---

[4] A joint status report filed in that case on June 3, 2010 stated that the parties were reviewing a
settlement agreement.  (McLaughlin Decl. Ex. 9 [Status Report, *Abdelkarim v. Tomlinson*, Civ. Action
No. 05-1783 (EGS), (June 3, 2010)].)

"Harb considers the station his own, hiring and firing employees as he pleases without supervision," and that Mr. Mawari eventually resigned from Radio Sawa, along with other several other non-Lebanese IRBs, because of discrimination.  (McLaughlin Decl. Ex. 5 [Mamoun Fandy, (Un)Civil War of Words: Media and Politics in the Arab World 110-111 (2007)].)  In a sworn statement on September 16, 2005, Mr. Mawari stated:

> Based on my experience and observations, I noted unfair practices committed by the principals at Radio Sawa . . . [including] serious deficiencies in hiring practices overseas, and specifically from Lebanon . . . . Furthermore, these unfair hiring practices discriminate against highly qualified US citizens of Middle Eastern/Arabic background, including persons with disabilities, who are loyal to their adoptive country.  [Those qualified applicants] clearly understand US policies and [its] objectives and would have done a far better job by advancing US interests . . . [and there was] no need to file for permanent residency for employees hired from overseas, mostly from Lebanon, who may not have had a personal interest other than exploiting a financial opportunity and obtaining US citizenship.

(Almutairi Decl. Ex. 23 [Statement of Munir Yahya Mawari (Sept. 16, 2005)].)

Concern about the Agency's favoritism and discriminatory practices became so widespread that the Subcommittee on Oversight and Investigations of the House Committee on International Relations convened hearings to examine, in part, whether various management standards constituted "an acceptable pattern and practice for the Alhurra network and its sister radio station [Radio Sawa]."  (McLaughlin Decl. Ex. 1 at 2.)  Questions by members of the subcommittee included why Al Hurra had "placed such an undue emphasis on Lebanese-Arabic speakers for work at the station" and why "so many people [were] brought from overseas to take language positions at the network when there were many in this and surrounding areas who could do the job."  (Id. at 54-55.)

## ARGUMENT

Plaintiff has sued under Title VII and the Rehabilitation Act to seek relief from the discrimination he suffered on the basis of his color, national origin, and disability, when the Agency

failed to hire him as a GS-12 IRB at Radio Sawa after he applied for that position under vacancy

announcements in June 2003, twice in October 2003, December 2003, and in March 2004.[5]

      In its motion, the Agency argues that the Court has jurisdiction to consider only claims

arising from the March 2004 Application.  On those claims, the Agency asserts that summary judgment

may be entered in its favor, even before affording Mr. Almutairi any discovery.  In Section III, below,

we show that the Agency's argument is wildly off the mark.  Plaintiff's claims relating to his March

2004 Application unquestionably raise genuine issues of material fact that preclude summary judgment.

      As to Mr. Almutairi's claims stemming from his four earlier applications, the Agency

argues that the Court lacks jurisdiction either because he has not yet exhausted his administrative

remedies (the June 2003 Application) or because he did not timely exhaust those remedies (all four

earlier applications).  As explained in Section I, below, the Agency is wrong about the June 2003

Application—Mr. Almutairi properly and timely invoked his administrative remedies, and his

complaints were accepted and considered by the EEOC.  Mr. Almutairi's claims stemming from the

rejection of his June 2003 Application, therefore, are properly before the Court.  And as we demonstrate

below in Section II, the Agency has not challenged the sufficiency of the Amended Complaint on the

merits regarding these claims, nor has it moved for summary judgment on them—nor could it.

Plaintiff's claims relating to his June 2003 Application, therefore, also survive the Agency's motion.

      As to the two applications Mr. Almutairi made in October 2003 and the one he submitted

in December 2003, Plaintiff acknowledges that he did not contact an EEO Counselor within 45 days of

---

[5] Mr. Almutairi acknowledges that he did not allege age discrimination in his initial EEOC complaint, and accordingly, that Count Two ("Discrimination in Violation of the Age Discrimination in Employment Act of 1967") in the Amended Complaint (Am. Compl. ¶¶ 46-47) is not properly before the Court.

receiving letters from the Agency rejecting those Applications.  Thus, Plaintiff also acknowledges, formal claims based on the rejection of those three applications may not be pursued in this action.  That does not mean, however, that the Agency's discriminatory actions regarding those applications are irrelevant.  To the contrary, Mr. Almutairi may use the rejections of the October 2003 and December 2003 Applications to show pretext and discrimination with respect to those claims relating to his June 2003 and March 2004 Applications, which are ripe for further proceedings before this Court.  *See Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2001).

I.    **PLAINTIFF'S CLAIMS BASED ON REJECTION OF HIS JUNE 2003 APPLICATION ARE PROPERLY BEFORE THE COURT.**

The Agency argues that the Court lacks subject matter jurisdiction over any claims arising from its rejection of Mr. Almutairi's June 2003 application because (1) the EEOC did not accept his claim for investigation and (2) in any event, he did not timely exhaust his administrative remedies. (*See* Def.'s Br. 13 n.7.)  Both arguments fail.  Mr. Almutairi did exhaust his administrative remedies because Mr. Almutairi filed a formal complaint, which the EEOC accepted and investigated, relating to his June 2003 Application.  And he did so in a timely fashion by contacting an EEO Counselor within the required timeframe.

A.    **Mr. Almutairi Applied In June 2003 For A GS-12 IRB Position, And He Presented Claims Relating To That Application To The EEOC, Which Investigated Them.**

Individuals who have been refused employment discriminatorily on the basis of color, national origin, or disability are precluded from filing a suit in federal court if they fail to exhaust administrative remedies by submitting their claims to the EEOC.  *See Chacko v. Patuxent Inst.*, 429 F.3d 505, 508-10 (4th Cir. 2005); *Jakubiak v. Perry*, 101 F.3d 23, 26-27 (4th Cir. 1996).  In this case, however, the Agency does not contend that Mr. Almutairi did not submit a claim to the EEOC relating

Page 16

to the Agency's rejection of his June 2003 Application.  Rather, the Agency asserts that (i) Mr. Almutairi's claim that he applied as a GS-12 IRB in June 2003 is "factually incorrect" because he actually applied for a position as a POV contractor at that time, and (ii) the Court lacks jurisdiction to hear claims that Mr. Almutairi was discriminatorily rejected as a POV contractor because the claim that the EEOC accepted for investigation did not include the charge that Mr. Almutairi had been rejected as a POV contractor.  (*See* Def.'s Br. 13 n.7.)

It is, indeed, true that the EEOC did not accept for processing claims regarding a POV position (*see* Def.'s Br. Ex. 13 at 2). But that is not Mr. Almutairi's claim.  Rather, Mr. Almutairi claims that in June 2003 he applied for a full-time GS-12 IRB position—*not* for a POV contractor position—and that he was later discriminatorily rejected for the GS-12 IRB position.  (Am. Compl. ¶ 11, 45, 49.) The Court unquestionably has jurisdiction here because Mr. Almutairi addressed that claim in his formal complaint to the EEOC, and the EEOC investigated it (and the Agency does not contend otherwise). And, in fact, Mr. Almutairi did apply for a GS-12 IRB position in June 2003, but even if the Agency had a basis to dispute it, that issue would not go to the Court's jurisdiction.

1.    *Mr. Almutairi submitted a formal complaint to the EEOC regarding his June 2003 Application.*

Courts have invariably held that "discrimination claims stated in the initial charge . . . may be maintained in a subsequent Title VII lawsuit."  *See, e.g.*, *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 964, 963 (4th Cir. 1996)).  Mr. Almutairi specified in his formal complaint that he was rejected for an "International Radio Broadcasting (Arabic) GS-1001-12" position.  In response to the question about how he was discriminated against, he related the details surrounding his June 2003 Application, including: that he "was interviewed, accepted, and sent for finger print and security approval;" that he "was asked to get

ready for the job as [he] will be called as soon as they get my security approval;" that he "did not get the call" but that he tried to talk to Mr. Harb and Mr. Harb's secretary to "request an appointment" to follow up on the matter; and that he was eventually told by Mr. Nasser that he could not be hired "because [the Agency] can not have [him] and [his] son together." (Almutairi Decl. Ex. 12 [Nasser Almutairi Complaint of Discrimination (April 26, 2004)] at 1-2.) Because these allegations all relate to his June 2003 application, Mr. Almutairi's claims stemming from his June 2003 Application may thus be maintained by the Court. *See Jones*, 551 F.3d at 300.

Moreover, the EEOC investigator considered and investigated these allegations. Although the BBG Report of Investigation notes—in one paragraph under a "Background Information" heading—that Mr. Almutairi "submitted two applications for an [IRB] position under vacancy announcement number M/P-03-02, that were dated October 9 and December 17, 2003" (Almutairi Decl. Ex. 14 at 3-4), the report also is replete with references to Mr. Almutairi's allegations that relate only to his June 2003 Application, including: (i) that the date of the alleged discrimination was listed as March 22, 2004, which was the date that Mr. Almutairi first listened to the voicemail message that Mr. Nasser had left on his answering machine (on March 17, 2004) regarding the Agency's reason for rejecting his June 2003 Application, (Almutairi Decl. Ex. 12 at 2 ("the most obvious [act of discrimination] was March 22, 2004," when Mr. Nasser "called me back and left a voice mail . . . [saying that the Agency could not hire me] Because we can not have you and your son together"); (ii) claims that Mr. Almutairi was not selected for the position after he "overheard an insulting comment [Mr. Nassif] made saying 'we don't need more people with disabilities here;'" and (iii) claims that Mr. Nasser told him he was not selected for the position because "the Agency policy was not to hire two persons from the same family." Accordingly, the Agency has no basis to maintain that the EEOC did not consider and investigate the

claims that Mr. Almutairi actually made relating to his June 2003 Application.[6]

        2.     *Mr. Almutairi applied in June 2003 for a GS-12 IRB position*.

The Agency's assertion that Mr. Almutairi applied only as a POV contractor in June 2003 has no factual basis, but merely is one of the ever changing reasons that the Agency has floated for rejecting Mr. Almutairi's June 2003 application.[7]  Mr. Nasser first stated to the EEO Counselor in an interview on April 7, 2003—before Mr. Almutairi submitted his formal complaint—that Mr. Nasser had interviewed Mr. Almutairi "for a full-time position with the Middle East Radio Network Division" but

---

[6] Even if, *arguendo*, the initial administrative complaint and subsequent EEOC investigation had not specifically referenced Mr. Almutairi's claims relating to his June 2003 Application, the Court would nevertheless have jurisdiction over these claims.  "The law in the Fourth Circuit is clear that '[a]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can *reasonably be expected to follow* the charge of discrimination.'"  *Bryant v. BBB*, 923 F. Supp. 720, 745 (D. Md. 1996) (quoting *Chisholm v. U.S. Postal Service*, 665 F.2d 482, 491 (4th Cir. 1981)) (emphasis added).  Thus, a court should consider not only the claims stated in the original EEOC complaint, but also "those *reasonably related* to the original complaint, and those developed by reasonable investigation of the original complaint."  *Jones*, 551 F.3d at 300 (quoting *Evans*, 80 F.3d at 963) (emphasis added).  For the reasons stated above, Mr. Almutairi's claims relating to the June 2003 Application unquestionably should have been developed by reasonable investigation of the other claims in his complaint.

[7] It is particularly telling that the *only* support that the Agency provides for its assertion that Mr. Almutairi applied as a POV contractor in June 2003 is the cover letter to Mr. Almutairi's October 9, 2003 Application (in response to Vacancy Announcement M/P-03-02), in which he stated, "I am honored **today** to submit my application for the Vacancy Announcement Number: M/P-03-02."  (*See* Def.'s Br. 13, n.7 (emphasis added by the Agency).)  The Agency apparently argues that because Mr. Almutairi used the word "today" in this October cover letter, it follows that he did not apply as a GS-12 IRB under Vacancy Announcement M/P-03-02 on an earlier date.  This argument holds no water.  Mr. Almutairi submitted a separate application under that same vacancy announcement on December 24, 2003, with a cover letter using the same language:  "I am honored **today** to submit my application for the Vacancy Announcement Number: M/P-03-02."  (Def.'s Br. Ex. 4 [Mr. Almutairi's December 2003 Application] at 1.)  Mr. Almutairi obviously did not intend to mean anything more by "today" than that he was simply submitting his application on those particular days.  Moreover, Vacancy Announcement M/P-03-02 was issued for "multiple position" and was to remain open indefinitely.  Mr. Almutairi submitted three applications under that vacancy announcement.  (Am. Compl. ¶¶ 11, 24, 27; Almutairi Decl. ¶¶ 7, 15.)

Page 19

that "he was never *officially* offered a position." (Almutairi Decl. Ex. 13 at 3 (emphasis added).) Mr. Nasser made no mention at that time that Mr. Almutairi had applied as a POV contractor, and, in fact, Mr. Nasser had told Mr. Almutairi less than three weeks earlier that the reason he had not been hired was because Agency regulations forbid employees to work at the same place as a relative. (Almutairi Decl. Ex. 7; Almutairi Decl. ¶ 16.) The Agency then changed its story (because various Agency employees were working at the same location as their family members), and Mr. Nassif subsequently claimed in an interview with the EEO Counselor on that "the decision not to hire [Mr. Almutairi] was not solely due to his son's employment," but also because Mr. Almutairi was overqualified to serve as a POV contractor. (Almutairi Decl. Ex. 13 at 4.) Mr. Nasser—taking a cue from his boss Mr. Nassif—in a later affidavit given to the EEOC investigator asserted for the first time that Mr. Almutairi had only applied for a part-time position—despite claiming earlier that Mr. Almutairi had interviewed for a full-time position. (Almutairi Decl. Ex. 15 [Affidavit of Munir Nasser (September 13, 2004)] at 2.)

In contrast to that web of shifting and inconsistent justifications, Mr. Almutairi has repeatedly and consistently asserted that he applied in June 2003 for a permanent position as a GS-12 IRB and not as a POV contractor. (*See, e.g.*, Almutairi Decl. ¶¶ 7-8.) In a letter to the EEO Counselor on March 27, 2004, for example, Mr. Almutairi noted, "I did not appl[y] for a contractor position, I applied for an editorial job."[8] (Almutairi Decl. Ex. 10 [Letter from Mr. Almutairi to Ms. Johnson (Mar. 27, 2004)] at 4.) Two weeks later, he wrote, "I'm assuring you once again I did not apply for a $15

---

[8] Mr. Almutairi refers to "IRB" positions and "editorial" position interchangeably. (*See* Almutairi Decl. Ex. 17 [Affidavit of Nasser Almutairi (Aug. 25, 2004)] at 2 ("For almost a year now, I have tried to get an editorial position with the [Agency]. . . . When the editorial position opened again on March 10th, 2004 [under Vacancy Announcement M/P-04-22], I applied once again"); Almutairi Decl. Ex. 18 [Affidavit of Nasser Almutairi, Addendum (Aug. 25, 2004)] at 2 ("As I said before, I applied for the editorial position every time the announcement popped-up").)

contractor job."  (Almutairi Decl. Ex. 11 [Letter from Mr. Almutairi to Ms. Johnson (Apr. 9, 2004)] at

2.)  In an affidavit submitted during the EEOC Investigation, he reiterated, "As I walked away from Mr.

Nassef [sic], I overheard an insulting comment he made saying, 'We don't need more people with

disabilities here.'  This was very hurtful and insulting to me but it has given me the strength to stand up

to such ignorance and apply again and again each time *this announcement for IRBs* has opened."

(Almutairi Decl. Ex. 18 [Affidavit of Nasser Almutairi, Addendum (Aug. 25, 2004)] at 3 (emphasis

added).)  And, of course, Mr. Almutairi maintains this position in the Amended Complaint and his

Declaration.  (Am. Compl. ¶ 22; Almutairi Decl. ¶¶ 7-8.)

     Moreover, even if the Agency's assertion about the position Mr. Almutairi applied for in

June 2003 had any basis (and it does not), the issue is not jurisdictional and not subject to a Rule

12(b)(1) motion.  A plaintiff must show that he "applied for the position in question" to set forth his

*prima facie* case, not to establish the court's jurisdiction.  *See McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973); *Chacko*, 429 F.3d at 509-10 (noting that claims are only jurisdictionally barred if "the

factual allegations made in formal litigation . . . [do not] correspond to those set forth in the

administrative charge").  As shown above, there is no question that the allegations of the Amended

Complaint match those in Mr. Almutairi's administrative complaint and, therefore, that the Court has

jurisdiction over the June 2003 Application claims.[9]

---

[9] But even if a jurisdictional question had properly been raised, dismissal would be inappropriate.  When
a defendant moves to dismiss a claim for lack of subject matter jurisdiction, alleging that the
jurisdictional allegations of the complaint are not true, the court may "go beyond the allegations of the
complaint *and in an evidentiary hearing* determine if there are facts to support the jurisdictional
allegations."  *Kerns v. US*, 585 F.3d 187, 192 (4th Cir. 2009) (emphasis in original).  If the court finds
that the disputed factual allegations "are intertwined with the facts central to the merits of the dispute, a
presumption of truthfulness should attach to plaintiff's allegations . . . [and the court] should then afford
the plaintiff the procedural safeguards such as discovery that would apply were the plaintiff facing a
direct attack on the merits."  *Id.* at 193.  In such cases, a court should dismiss for lack of subject matter

Applying the appropriate standards—*i.e.*, that of Rule 12(b)(6)—the Agency's motion must be denied.  When considering a motion to dismiss for failure to state a claim, the Court must "accept all factual allegations in the complaint as true," *Tellabs,* 551 U.S. at 309 (2007), and "disregard the contrary allegations of the opposing party."  *Stoyanov v. Winter*, Nos. RDB 05-1567 and RDB 05-1611, 2006 WL 5838450, at *3 (D. Md. July 25, 2006) (citing *A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969)).  Mr. Almutairi has sufficiently alleged that he "applied for a GS-12 Arabic IRB position (BBG/IBB Vacancy Announcement M/P-03-02) with MERN/Radio Sawa in June 2003."  (Am. Compl. ¶ 11.)  That allegation must be accepted as true.  On a Rule 12(b)(6) motion, the Agency's contrary—and counterfactual—assertion that Mr. Almutairi applied for a POV position must be disregarded.  *See Stoyanov*, 2006 WL 5838450, at *3.

### B.    Plaintiff Timely Exhausted His Administrative Remedies.

Among the administrative prerequisites to filing a lawsuit based on personnel actions such as discriminatory non-hiring, a claimant must contact an EEO Counselor "within 45 days of the effective date of the action." *Jakubiak*, 101 F.3d 23 at 26 (quoting 29 C.F.R. § 1614.105(a)(1)).  The Agency argues that Mr. Almutairi's claims relating to his June 2003 Application must be dismissed for lack of subject matter jurisdiction because Mr. Almutairi did not "contact an EEO Counselor within the 45-day time limit."  (Def.'s Br. 13.)  The Agency's argument is baseless.

First, the Agency mistakenly asserts that an applicant's failure to contact an EEO Counselor within 45 days of a discriminatory employment action "preclud[es] a district court from hearing the claim for lack of subject matter jurisdiction."  (*See* Def.'s Br. 12.)  In an employment discrimination case, whether a plaintiff timely exhausted his administrative remedies does not raise

jurisdiction "only when [Plaintiff's] jurisdiction allegations are 'clearly . . . immaterial.'"  *Id.* (quoting (with ellipses) *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

issues of jurisdiction. *Jones*, 551 F.3d at 301 n.2. As the Supreme Court held in *Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982), initiating an EEOC claim within the prescribed timeframe "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Id*. Courts have applied this reasoning to the timing requirement applicable to contacting an EEO Counselor. *See, e.g., Boyd v. Gutierrez*, No. DKC 2004-1535, 2005 WL 2653946, at *4 (D. Md. Oct. 17, 2005) (noting that while "[t]he general rule is that an aggrieved federal employee must initiate contact within . . . 45 days of the effective date of the action," "[t]his time period is not jurisdictional, however, and may be subject to waiver, estoppel and equitable tolling"); *Elezovic v. England*, No. PJM 03-3649, 2005 WL 487127, at *4 (D. Md. Feb. 15, 2005) (citing *Zipes* for the proposition that the requirement to contact an "EEO counselor within 45 calendar days of the alleged event . . . is not jurisdictional, but operates as a statute of limitations").[10] Accordingly, Mr. Almutairi's claims relating to his June 2003 Application may not be dismissed under Rule 12(b)(1) for lack of subject jurisdiction based on timeliness issues. It follows, therefore, that any challenge by the Agency to the timeliness of Mr. Almutairi's invocation of the EEO complaint process must be assessed under Rule 12(b)(6)—and that the relevant facts alleged in the Amended Complaint must be accepted as true for purposes of this motion.

---

[10] The Agency's citation of two district court cases with language suggesting otherwise cannot counter this clear Supreme Court and Fourth Circuit authority. *See Thornton v. Chrysler Corp.*, 581 F. Supp. 84, 85 (D. Md. 1983) ("There are some indications in the case law that failure of a plaintiff timely to" meet certain administrative requirements "deprives a federal district court of subject matter jurisdiction. That question, however, was determined to the contrary . . . by the Supreme Court in *Zipes*"). The single appellate case that Defendant cites for the proposition that "[b]y failing to contact an EEO Counselor within the 45-day time limit, Plaintiff failed to exhaust his administrative remedies" (Def.'s Br. 13) clearly holds that the timing requirement to contact an EEO Counselor does not act as a jurisdictional bar. *See Zografov v. V.A. Med. Ctr.*, 779 F.2d 967, 968-69 (4th Cir. 1985) ("conclud[ing] that the district court in this case incorrectly construed the thirty-day limit in 29 C.F.R. § 1613.214(a)(1) as a limit on the district court's subject matter jurisdiction").

Second, the Agency has provided no cognizable support for its assertion that Mr.

Almutairi was untimely in contacting the EEO Counselor about the rejection of his June 2003

Application.  To be sure, he applied for the position in June 2003 and first contacted an EEO Counselor

in March 2004.  But that in and of itself tells us nothing about the timeliness of his contacting the EEO

Counselor.  In failure to hire cases, a claimant must contact an EEO Counselor "within 45 days of the

*effective date* of the [adverse employment] action."  *Jakubiak*, 101 F.3d at 26 (quoting 29 C.F.R. §

1614.105(a)(1)).  Thus, the issue here is when was the effective date of the Agency's rejection of Mr.

Almutairi's June 2003 Application.

Recently, this Court had the occasion to apply the so-called *Flannery* test to determine

the "effective date" of a wrongful termination.  *See Kim v. Potter*, No. DKC 09-2973, 2010 WL

2253656, at *5-6 (D. Md. June 2, 2010) (citing *Smith v. Potter*, 445 F.3d 1000 (7th Cir. 2006) and

*Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632 (7th Cir. 2004)).  Under the *Flannery* test, to

determine the effective date on which "an unlawful employment practice [occurred]: (1) there must be a

final, ultimate, non-tentative decision to terminate the employee; and (2) the employer must give the

employee 'unequivocal' notice of its final termination decision."  *Id.* at *5 (quoting *Potter*, 445 F.3d at

1007 (7th Cir. 2006)).  The *Flannery* test is equally applicable to other employment actions, including

failure-to-hire cases.  *See Del. State Coll. v. Ricks*, 449 U.S. 250, 257-59 (1980) (holding that effective

date in a failure-to-promote case occurred when (1) a college decided not to grant tenure to a professor

and (2) the professor was notified); *Kaleta v. Nicholson*, No. 07 C 606, 2008 WL 5386805, at *2 (N.D.

Ill. Dec. 22, 2008) (quoting *Potter* in stating that the *Flannery* "test applies not only to termination

decisions but to any 'unlawful employment practice'"); *Haddad v. ITT Indus., Inc.*, No. 1:05-CV-370-

TLS, 2007 WL 141949, at *6 (N.D. Ind. Jan. 12, 2007) (applying the *Flannery* test to a failure-to-

Page 24

promote case).

Applying the *Flannery* test here, the effective date of the Agency's failure to hire Mr. Almutairi pursuant to his June 2003 employment application occurred in early March 2004, when Mr. Almutairi was given non-tentative and unequivocal notification of the Agency's decision. As Mr. Almutairi has alleged in the Amended Complaint, he received a conditional offer of employment in June 2003 subject to his obtaining a security clearance. In August 2003, when Mr. Almutairi learned that he had received his clearance but had not heard from the Agency, he contacted the Agency only to be told first (and falsely) that there had been an issue with his clearance, and later, that the management had expressed an unspecified "reservation" about his employment. (Am. Compl. ¶ 18.) Mr. Nasser stated that he would call Mr. Almutairi once those reservations had been resolved, and Mr. Almutairi unsuccessfully attempted to contact Agency management himself to help resolve the "reservation" that appeared to be delaying his start date. (*Id.* at ¶ 18-19.) It was not until early March 2004 that Mr. Nasser finally and unequivocally told Mr. Almutairi that he would not be hired for the position. (*Id.* at ¶ 20.) The Agency has not alleged—in the motion to dismiss or *at any point during the entire administrative proceedings*—that either this adverse employment action or Mr. Almutairi's notification thereof occurred at any other time. Therefore, it is not even possible to determine the date on which the Agency believes that the 45-day time limit expired.

Viewing the factual allegations of the Amended Complaint as true and drawing all reasonable inferences in favor of Plaintiff, the Court should find that the "effective date" of the employment action relating to his June 2003 Application occurred in early March 2004. Accordingly, because Plaintiff initiated contact with an EEO Counselor on March 8, 2004 regarding that employment action, he satisfied the administrative timeliness requirements of 29 C.F.R. § 1614.105(a)(1). At a

minimum, a fact issue about the timeliness of his administrative claim exists that cannot be resolved under Rule 12(b)(6).

Third, even if the effective date of the Agency's rejection of Mr. Almutairi's June 2003 Application had occurred earlier, the Court should find that Plaintiff nevertheless timely exhausted his administrative remedies because the timing requirements should have been waived. "[W]aiver of the 45-day time limit is mandatory . . . [when a plaintiff shows] that he or she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred." *Jakubiak*, 101 F.3d at 27. For the reasons stated above, if the Agency in fact made a decision to reject Mr. Almutairi's June 2003 Application earlier than March 2004, Mr. Almutairi did not know about it and reasonably could not have known about it. The 45-day time limit, therefore, should have been waived and the Court should find that Plaintiff timely contacted the EEO Counselor. *See Figueroa v. Geithner*, --- F. Supp. 2d ----, No. JFM-08-1805, 2010 WL 1875754, at *6 (D. Md. May 10, 2010) (citing *Shiver v. Chertoff*, 549 F.3d 1342 (11th Cir. 2008) for the proposition that an administrative complaint is timely if filed with 45-days of "when Plaintiff became aware of his allegedly discriminatory nonselection"); *Butts v. Donley*, No. AW-08-1963, 2009 WL 2778273, at *3 (D. Md. Aug. 28, 2009) (finding that a plaintiff timely contacted an EEO counselor because "the Court [wa]s not convinced that Plaintiff knew or had reason to know of the effective date of the" employment action). And again, at a minimum, there is a fact issue regarding waiver that renders Rule 12(b)(6) dismissal improper. *See Stroyanov*, 2006 WL 5838450, at *8 (denying motion to dismiss where "[p]laintiffs have alleged certain facts that, if true, might support a claim 'that [they] did not know and reasonably should not have known that the discriminatory matter or personnel action occurred'").

## II.    PLAINTIFF HAS ADEQUATELY ALLEGED CLAIMS OF EMPLOYMENT DISCRIMINATION.

The Agency does not dispute the sufficiency of the Amended Complaint on the merits under Rule 12(b)(6) with respect to any of Mr. Almutairi's claims. Although the Agency discusses in generic terms the standards applicable under Rule 12(b)(6)—along with standards applicable under Rule 12(b)(1) and Rule 56(c)—the Agency specifically argues only that the claims based on the four applications that Mr. Almutairi submitted in 2003 should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction, and that the Agency should be granted summary judgment under Rule 56(c) on the claims based on the application that Mr. Almutairi submitted in March 2004. Nowhere in the Agency's brief, however, is any argument challenging the Amended Complaint's sufficiency on the merits for any of these claims.

Nor could such a Rule 12(b)(6) motion succeed. Under Rule 8(a), a plaintiff need only provide a short and plain statement of the claim showing that the pleader is entitled to relief. While a plaintiff in an employment discrimination case must plead facts sufficient to state the elements of his claim, to survive a motion to dismiss, the plaintiff "need not plead facts that constitute a *prima facie* case under the framework of *McDonnell Douglas*," *see Swierkiewicz v. Sorema*, 534 U.S. 506, 511-15 (2002); *Jordan v. Alt. Reservoir Corp*., 458 F. 3d 332, 346-47 (4th Cir. 2006), but need only plead enough facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Id.* at 555-56; *Tellabs,* 551 U.S. at 309 (2007).

As discussed above, the Agency's "exhaustion" arguments relating to the 2003 applications do not raise genuine issues. The Court's subject matter jurisdiction is not properly asserted under Rule 12(b)(1). These procedural arguments, although incorrect, are properly asserted under Rule 12(b)(6).

Mr. Almutairi has stated a claim to relief that is plausible on its face.  He has alleged: that he is a member of a protected group based on his color, national origin, and disability (Am. Compl. ¶¶ 2-3, 15); that he repeatedly applied for a GS-12 IRB at Radio Sawa under multiple vacancies in June 2003, October 2003, December 2003, and March 2004 (*id.* at ¶¶ 11, 19, 24, 27, 29); and that he was well qualified for this position (*id.* at ¶¶ 7-9, 10, 30).  Furthermore, Mr. Almutairi has alleged facts sufficient to show that the Agency repeatedly rejected those applications under circumstances giving rise to an inference of unlawful discrimination, including allegations:  that the Agency repeatedly rejected his applications while hiring predominantly younger, light-skinned, Lebanese-origin applicants without disabilities who had considerably less education, language skills, relevant knowledge and journalistic experience than Mr. Almutairi (*id.* at ¶ 10, 23, 32, 34, 35); that despite extending Mr. Almutairi a conditional offer of employment, the Agency ultimately rejected Mr. Almutairi for the GS-12 IRB position after the hiring official at the Agency remarked that "We don't need more people with disabilities here" (*id.* at ¶¶ 12, 15, 20); that the Agency provided a series of shifting, false, misleading, and inconsistent reasons for its repeated rejections of Mr. Almutairi (*id.* at ¶¶ 18, 20, 21, 22, 25, 26, 27, 28, 30); and that the Agency officials conducted nearly all its business—from hiring and firing to scheduling various broadcast programs—under an ever-pervasive pro-Lebanese milieu (*id.* at ¶¶ 10, 11, 23, 32, 33, 35, 36, 45).  Accordingly, even if the Agency had argued for the dismissal of any aspect of the Amended Complaint for failure to state a claim under the Rule 12(b)(6) standard, that motion would have to be denied.

## III.    THE AGENCY'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED.

The Agency assumes that the burden-shifting framework of *McDonnell Douglas* will govern Mr. Almutairi's claims and argues that it is entitled to summary judgment with respect to the

claims relating to Mr. Almutairi's March 2004 Application because Mr. Almutairi cannot establish a

*prima facie* case within that framework in that (1) Mr. Almutairi has not shown that he is disabled and

(2) the Agency hired an applicant within Mr. Almutairi's protected class with respect to color and

national origin. (Def.'s Br. 14-16.) The Agency also argues that, even if Mr. Almutairi has established

that he is disabled or that the Agency rejected him under circumstances giving rise to an inference of

unlawful discrimination, the Agency is still entitled to summary judgment because Mr. Almutairi cannot

show that Agency's "legitimate, nondiscriminatory reason" for rejecting him—that is, that it hired a

better-qualified, dark-skinned woman of Sudanese national origin instead of Mr. Almutairi—is

pretextual. (*Id.* at 16-18.)

    The Agency's assumption that *McDonnell Douglas* will apply here is not necessarily

warranted. A plaintiff need not invoke that framework if he has direct evidence of prohibited

discrimination in the hiring process. *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542,

548 (4th Cir. 1995). Such direct evidence may include "conduct or statements that both reflect directly

the alleged discriminatory attitude and that bear directly on the contested employment decision,"

especially when discriminatory statements are made by the relevant decision maker. *See Schafer v. Md.*

*Dept. of Health and Mental Hygiene*, No. 08-1647, 2009 WL 5183692 (4th Cir. Dec. 30, 2009). Here,

the statements by Mr. Nassif—who was personally responsible for the decision to reject Mr.

Almutairi—that he did not want any more disabled people at Radio Sawa, demonstrate not only his

discriminatory attitude against the disabled, but also bear directly on whether he would be willing to hire

Mr. Almutairi under the Vacancy Announcement at issue. Other comments may serve as direct

evidence that Mr. Harb (Mr. Nassif's direct superior) and possibly Mr. Nassif himself—both with hiring

responsibilities for IRBs—had a personal bias in favor of persons of Lebanese national origin and thus

against those of Yemeni national origin.  In any event, because no discovery has yet taken place, it is too early to tell whether Plaintiff will uncover additional direct evidence, thereby making the *McDonnell Douglas* framework irrelevant.  *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511-12 (2002) (because "discovery might uncover such direct evidence[,] [i]t thus seems incongruous to require a plaintiff . . . to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered").

But even under the *McDonnell Douglas* framework invoked by the Agency, the Agency's arguments are meritless. There are, at a minimum, genuine issues of material fact as to whether:  Mr. Almutairi is disabled or regarded as disabled by the hiring officials at Radio Sawa; the Agency hired an individual outside the protected class; and the Agency's purported "legitimate, non-discriminatory" reason for rejecting Mr. Almutairi was pretextual.

A.    **Mr. Almutairi Has Adequately Established His Disability.**

To establish a *prima facie* case of discrimination under the Rehabilitation Act, a plaintiff must first show, under the *McDonnell Douglas* framework, that (1) he has a disability as defined by the Rehabilitation Act, (2) he is qualified for the position, and (3) he was rejected for the position on the basis of his disability.  *Davis v. Univ. of N.C.*, 263 F.3d 95, 99 (4th Cir. 2001).  The Agency concedes that Mr. Almutairi was qualified for the GS-12 IRB position, and it does not contest—at least for purposes of whether Mr. Almutairi established his initial burden under the *McDonnell Douglas* framework—that Mr. Almutairi was rejected for that position on the basis of his disability.  (Def.'s Br. 14.)  Rather, the Agency argues that Mr. Almutairi has not met his initial burden because he has not shown that he is disabled under the Rehabilitation Act.  That Act provides that an individual is disabled if he "(i) has a physical or mental impairment which substantially limits one or more of such person's

major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."  *School Bd. of Nassau County, Fla., v. Arline*, 180 U.S. 273, 279 (1987) (citing the Rehabilitation Act, 29 U.S.C. § 706(7)(B)).  The Agency posits that Mr. Almutairi "has not alleged, much less provided any evidence, that he is substantially limited in any major life activities, has a record of such impairment; or is regarded as having such an impairment."  (Def.'s Br. 15.)  The Agency is completely wrong.

       1.     *Mr. Almutairi has alleged—and the evidence supports—that he is substantially limited in a major life activity.*

The Supreme Court adopted a three-step test to determine whether an individual is disabled because of a substantial limitation of a major life activity, under which a court should consider: (i) whether the individual had a physical impairment; (ii) whether the life activity upon which the individual relied constitutes a major life activity; and (iii) whether the impairment substantially limited that major life activity.  *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).  Mr. Almutairi satisfies this test.

The Agency does not dispute that Mr. Almutairi has a physical impairment.  As alleged in the Amended Complaint, and as demonstrated by the evidence, Mr. Almutairi suffered serious injuries (including breaks) to his back, hip, leg, and ankle in an automobile accident in 1997 and has since "suffer[ed] ongoing serious pain in his leg, walk[ed] with a pronounced limp, and [has needed to] use a leg brace and a cane to stand or walk."  (Am. Compl. ¶ 3; *See* Almutairi Decl. ¶¶ 2-3; Almutairi Decl. Ex. 14 at 5; Almutairi Decl. Ex. 1 [Statement of P. Gupta. MD (Dec. 5, 1998)].)

The Agency also does not dispute that walking—the life activity upon which Mr. Almutairi relies—constitutes a major life activity.[11]    Further, the Agency does not appear to dispute

_____

[11] As the Supreme Court has noted, the regulations promulgated by the Department of Health and Human Services "provide an important source of guidance on the meaning of" the Rehabilitation Act.

that Mr. Almutairi's impairments substantially limit his ability to walk.  As Mr. Almutairi has alleged,

and as the evidence shows, Mr. Almutairi's permanent injuries severely restrict his ability to walk more

than very short distances: he "can only walk five steps without assistance, after which he needs to stop

and lean against something to rest."  (Am. Compl. ¶ 3; Almutairi Decl. ¶ 2; *see* Almutairi Decl. Ex. 2

[Statement of Jamal Numan (May 26, 2006)] (discussing Mr. Almutairi's "walking disability").) [12]

We are hard pressed, therefore, to understand the basis for the Agency's argument.  It

does not appear to dispute Mr. Almutairi's allegations—let alone the evidence presented to the EEOC—

about his injuries and their effect on his ability to walk.  Furthermore, the Agency has presented no

contrary evidence of its own as to Mr. Almutairi's disability.  Mr. Almutairi has demonstrated that he

has a disability under the Rehabilitation Act, (*see* Almutairi Decl. Ex. 14 at 5), and yet, the Agency

insists that Mr. Almutairi has not established that he is disabled.  Clearly, the Agency has no argument at

all.

2.    *The Agency regarded Mr. Almutairi as disabled.*

Moreover, the Agency overlooks an important aspect of the Rehabilitation Act:  a person

---

*Arline*, 180 U.S. at 279.  These regulations define "major life activities" to include "functions such as caring for one's self, performing manual tasks, *walking*, seeing, hearing, speaking, breathing, learning, and working."  *Id.* at 280 (citing 45 C.F.R. § 84.3(j)(2)(ii)) (emphasis added)).

[12] Mr. Almutairi had demonstrated that he had a disability under the Rehabilitation Act.  (*See* Almutairi Decl. Ex. 14 at 5.)  The EEOC's interpretive guidance provides that "an impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform the same major life activity.  *Thus, for example, an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking.*"  29 C.F.R. § 1630 app. (emphasis added); *see Carbaugh v. Pangborn Corp.*, No. Civ. JFM-00-2719, 2001 WL 121769, at *3 (D. Md. Feb. 12, 2001) (quoting the EEOC's guidance in noting that an individual who could "only walk for very brief periods of time" would fall under the most extreme category of substantial limitation); *Johnson v. Maryland*, 940 F. Supp. 873, 877 (D. Md. 1996) (holding that walking with a limp constitutes "a substantial limitation of a major life activity and thus a disability under the ADA for purposes of [a] Motion for Summary Judgment.").

is considered disabled if the employer *regards* him as having an impairment which substantially limits a major life activity. *Arline*, 180 U.S. at 279. Here, Mr. Almutairi alleged—and has presented evidence—that the Agency's managing editor, Mr. Nassif, who made the decision not hire Mr. Almutairi, did so at least in part because Mr. Nassif believed that "[w]e don't need more people with disabilities here." (Am. Compl. ¶ 15; Almutairi Decl. ¶ 11.) At a minimum, this creates a genuine issue of material fact about whether the Agency regarded Mr. Almutairi as disabled. *See Haulbrook v. Micheline N. Am., Inc.*, 252 F.3d 696, 703 (4th Cir. 2001); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) (noting that "[i]t is the perception of the decision maker which is relevant").

3. *The Agency has not met its burden of showing the absence of supporting evidence or genuine issues of material fact.*

The Agency seems confused about burdens, arguing that Plaintiff has failed to meet his burden of proving that he is disabled. But we are only at the *pleading* stage of this lawsuit. Plaintiff's burden at this stage is a pleading burden, not a proof burden. As shown above, Plaintiff has adequately pled that he is disabled within the meaning of the Rehabilitation Act.

The Agency nonetheless has moved for summary judgment on this issue before any discovery. Thus the *Agency* has taken on a burden. A party that moves for summary judgment, with respect to an issue on which the nonmoving party bears the burden of proof, assumes the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A movant that fails to meet that burden, however, must instead "produce evidence showing the absence of a genuine issue of material fact." *Id.*

Because the Agency cannot show that there is no evidence to support Mr. Almutairi's claim of disability, the Agency is left with trying to produce evidence showing that there are no genuine issues of material fact on the issue of disability. The Agency has utterly failed to carry its burden. It has

produced not one shred of evidence contradicting Mr. Almutairi's claim that he is disabled.  More than

that, the Agency has (i) not provided any explanation as to why the Agency believes that Plaintiff has

not shown that he is disabled; (ii) not questioned the EEOC's Investigation Report's finding that

Plaintiff was disabled (*see* Almutairi Decl. Ex. 14, at 5); (iii) not cited any case law addressing why

Plaintiff's specific impairments would not constitute a disability; and (iv) not even been willing to state

that Plaintiff is not, in fact, disabled.  In short, the Agency has not established that there is no genuine

issue of material fact nor provided a reason why the Agency would be entitled to judgment as a matter

of law.  Accordingly, the Agency's motion for summary judgment regarding Plaintiff's claims under the

Rehabilitation Act should be denied.

**B.**    **Genuine Issues Of Material Fact Exist Whether The Agency's Rejection of Mr. Almutairi's Application Under Consideration Give Rise To An Inference of Unlawful Discrimination On The Basis Of National Origin Or Color.**

As with the Rehabilitation Act, plaintiffs who bring claims under Title VII must first

establish a *prima facie* case under the burden-shifting *McDonnell Douglas* framework invoked by the

Agency:  a plaintiff must show that "(1) he is a member of a protected group; (2) he applied for the

position in question; (3) he was qualified for the position; and (4) he was rejected for the position under

circumstances giving rise to an inference of unlawful discrimination."  *Brown v. McLean*, 159 F.3d 898,

902 (4th Cir. 1998).  Typically, a plaintiff may satisfy the fourth element by showing that:  another

individual outside the protected class was hired instead of him, *see Langerman v. Thompson*, 155 F.

Supp. 2d 490, 495-96 (D. Md. 2001); the position remained open and the employer continued to seek

applicants, *see McDonnell Douglas*, 411 U.S. 792, 802 (1973); or the "employer's hiring of another

person within the protected class is calculated to disguise its act of discrimination toward the plaintiff,"

*see Brown*, 159 F.3d 898, 905-06 (4th Cir. 1998).

With respect to Mr. Almutairi's claims brought under Title VII relating to his March 2004 Application, the Agency concedes that Mr. Almutairi meets the first three *McDonnell Douglas* requirements, but argues that it is entitled to summary judgment on the ground that Mr. Almutairi cannot meet the fourth requirement—namely, that he cannot show that "he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination"—because the Agency claims to have hired an applicant who "has black skin and is not of Lebanese national-origin," and thus is within the protected class.  (Def.'s Br. 14-15.)

To be granted summary judgment, the Agency must show that "there exists no genuine issue as to any material fact and [it] is entitled to judgment as a matter of law."  *Donaldson v. Maryland*, No. RWT-09-1124, 2010 WL 419367, at *1 (D. Md. Jan. 28, 2010) (citing Fed. R. Civ. P. 56(c) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 447 U.S. at 251-52. Accordingly, the Agency's motion for summary judgment must be denied if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.  In reviewing a motion for summary judgment, the Court "must view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [his] favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr. Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  Viewing the evidence in that light, the Court may grant summary judgment only if it finds that "a reasonable jury could only rule in favor of" the moving party. *Id.*  The Court must deny the motion "if reasonable minds could differ." *Id.*

As noted above, as the moving party but not the party with the burden of proof on establishing a *prima facie* case, the Agency must either show that there is *no* evidence supporting Mr. Almutairi's position that circumstances allow an inference of unlawful discrimination, or else provide evidence that there are no genuine issues of material fact. *Celotex*, 477 U.S. at 325. Again, the Agency cannot carry that burden.

First, Mr. Almutairi's national origin is Yemeni, and the Agency does not contest that a non-Yemeni was hired for the position. National origin "refers to the country where a person was born, or more broadly, the country from which his or her ancestors came." *Dolgaleva v. Virginia Beach City Public Schools*, No. 08-1515, 2010 WL 325957, at *7 n.4 (4th Cir. Jan. 29, 2010) (quoting *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973)). To first show that he was rejected for the GS-12 position under circumstances giving rise to an inference of unlawful national-origin discrimination, Mr. Almutairi need only show that a non-Yemeni was hired instead of him. *Langerman*, 155 F. Supp. 2d at 495-96. Mr. Almutairi has met that burden. (Am. Compl. ¶ 30; Almutairi Decl. ¶ 18.)

Second, and perhaps most importantly, there are material issues of genuine fact as to whether the Agency actually hired Ms. Abuzaid to fill the vacancy announced in M/P-04-22. As noted above, and as described in the subsequent section, it appears that the Agency hired Ms. Abuzaid as a GS-12 IRB at Radio Sawa in response to a different vacancy announcement in 2002, and therefore not in response to vacancy announcement M/P-04-22. This unquestionably establishes a genuine issue of material fact.

Third, even if Ms. Abuzaid was hired for the March 2004 vacancy and is considered in the same protected class as Mr. Almutairi, genuine issues of fact exist, for the reasons provided in the

section directly below, as to whether the Agency hired her to disguise its acts of discrimination against

Mr. Almutairi.  *See Brown*, 159 F.3d at 905-06.

    **C.**    **<u>Genuine Issues Of Material Fact Exist As To Whether The Agency's Proffered "Legitimate, Nondiscriminatory" Reason For Rejecting Mr. Almutairi Was Pretextual.</u>**

      Under the *McDonnell Douglas* framework, once the plaintiff establishes a *prima facie*

case of discrimination, the burden shifts to the defendant to "produc[e] evidence that the plaintiff was

rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason."  *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Texas Dept. of Cmty Affairs v.*

*Burdine*, 450 U.S. 248, 254 (1981)).  "[O]nce the employer produces sufficient evidence to support a

nondiscriminatory explanation for its decision—[the plaintiff] must be afforded the opportunity to prove

by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true

reasons, but were a pretext for discrimination."  *Id.* at 143.  The Agency argues that, even if Mr.

Almutairi alleged a *prima facie* case of discrimination, he cannot show that the legitimate reason that the

Agency provided for rejecting him was not its true reasons but a pretext for discrimination.  This

argument must fail, however, because the Agency has not shown that there are no genuine issues of

material fact—*i.e.*, that no reasonable jury could find—that its proffered justification for rejecting Mr.

Almutairi was a pretext for discrimination.

      In this case, during the EEOC administrative investigation, the Agency provided the

following purported "legitimate, nondiscriminatory reason" for failing to hire Mr. Almutairi under his

March 2004 Application: Mr. Nassif "stated under oath" that he selected Zahrat Abuzaid, "a U.S. citizen

of Sudanese origin with black skin," as a GS-12 IRB for Radio Sawa instead of Mr. Almutairi "on the

basis of her experience and background" and his "own personal observation" of her work.  (Def.'s Br.

15, 16.)  But the Agency has presented this *exact same reason* in a prior proceeding for failing to hire

other non-Lebanese applicants under a different vacancy announcement for GS-12 IRBs that was filled

two years before the one at issue in the present case.  In *Abdelkarim v. Tomlinson*, five individuals sued

the Agency for employment discrimination, alleging that they were not hired as GS-12 IRBs at Radio

Sawa in 2002 because of their national origin, religion, and age.  (*See* McLaughlin Decl. Ex. 6 at ¶ 1.)

Like Mr. Almutairi, they allege that the Agency discriminated against them because of bias in favor of

hiring persons of Lebanese national origin.  (*Id.*)  The Agency moved for summary judgment,

claiming—as a reason for failing to hire the plaintiffs as GS-12 IRBs—that Mr. Harb (Mr. Nassif's boss)

had selected Zahrat Abuzaid for a GS-12 position in 2002 based on her experience and Mr. Harb's "own

personal observation" of her work.[13]  (*See* McLaughlin Decl. Ex. 7 at 27, 30-31, 77 80.)  In fact, Ms.

Abuzaid's resume, which the Agency claimed it received and considered in March 2004, specifically

states that she worked at VOA/Radio Sawa from "2002-Present," cutting off any possible explanation

that Ms. Abuzaid had taken time off and had been rehired later.  (*See* Def.'s Br. Ex. 17 [Resume of

Zahrat Abuzaid] at 1.)

       Unquestionably, this evidence creates a genuine issue of material fact whether Ms.

Abuzaid was actually selected in March 2004 under Vacancy Announcement M/P-04-22, let alone

whether her selection is a "legitimate, non-discriminatory reason" for the Agency's failure to hire Mr.

Almutairi.[14]  Indeed, Mr. Almutairi may be entitled to ask the Court to judicially estop the Agency from

---

[13] The Agency described Ms. Abuzaid in the *Abdelkarim* case as a non-citizen.  This raises an additional genuine issue of material fact, as the Agency's hiring practices required that preference be given to U.S. citizens.  Mr. Almutairi is a U.S. citizen.  (*See* Am. Compl. ¶ 34.)

[14] The only apparent connection between Ms. Abuzaid's resume and Vacancy Announcement M/P-04-22 is a hand-written marginal note stating "M/P-04-22."  There is no evidence regarding when that notation was placed on her resume, who placed it there, or for what purpose.  The selection document is

claiming that it hired Ms. Abuzaid as a GS-12 IRB at Radio Sawa in March 2004 under Vacancy

Announcement M/P-04-22.[15]  If the Agency is so estopped, it would be left with no legitimate,

nondiscriminatory reason with which to rebut Mr. Almutairi's *prima facie* case.

Additionally, showing that the Agency's proffered justification for not hiring Mr.

Almutairi was fake would be strong evidence of pretext.  A "plaintiff may attempt to establish that he

was the victim of intentional discrimination by showing that the employer's proffered explanation is

unworthy of credence."  *Reeves*, 530 U.S. at 143.  A trier of fact may "infer the ultimate fact of

discrimination from the falsity of the employer's explanation" and, in appropriate circumstances, "can

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a

discriminatory purpose . . . [as] the factfinder is entitled to consider a party's dishonesty about a material

fact as affirmative evidence of guilt."  *Id.* at 147 (internal quotation marks removed).  Accordingly, a

---

bare-boned, and combines only a list of the names with the selection notation, which only designates
candidates as "S" or "NS" without any explanation  (Almutairi Decl. Ex. 22 [Qualified Candidates for
M/P-04-22].)  There are only two documents currently in the record to support the Agency's claim that it
hired Ms. Abuzaid in March 2004 in response to Vacancy Announcement M/P-04-22: her resume and an
Agency document reflected her selection over other candidates.

[15] Judicial estoppel "precludes a party from adopting a position that is inconsistent with a stance taken in
prior litigation.  The purpose of the doctrine is to prevent a party from playing fast and loose with the
courts, and to protect the essential integrity of the judicial process."  *1000 Friends of Maryland v.
Browner*, 265 F.3d 216, 226 (4th Cir. 2001) (quoting *Lowery v. Stovall*, 92 F.3d 291, 223 (4th Cir.
1996)).  Judicial estoppel would be appropriate because the Agency has explicitly stated that *this same
candidate* (Zahrat Abuzaid) was selected for *the same position* (GS-12 IRB for Radio Sawa) under *two
separate vacancy announcements* in 2002 and 2004 for *these same reasons* (experience and "personal
observation" of her work) to rebut accusations of employment discrimination by different plaintiffs in
different courts.  The D.C. court accepted the Agency's position that Ms. Abuzaid had been hired as a
GS-12 IRB under the 2002 vacancy announcement.  (McLaughlin Decl. Ex. 8 at 121 (noting that the fact
that other individuals had been selected to fill the positions was established); McLaughlin Decl. Ex. 7 at
79-80 (the Agency noted, "as a material fact as to which there is no genuine issue," that Zahrat Abuzaid
had been hired for the position)).  *See Saul Subsidiary I Ltd Partnership v. Best Buy Stores, L.P.*, No.
JKS 08-930, 2009 WL 3348235, at *4-5 (D. Md. Oct. 15, 2009) (applying estoppel where a party
intentionally misled the court to gain unfair advantage when it tried to "win[] twice on the basis of these
incompatible positions").

reasonable jury could find that the Agency's justification for rejecting Mr. Almutairi was false or, at best, inconsistent, and therefore conclude that the justification was a pretext for discrimination. *See id.*; *Alvarado v. Board of Trs.*, 928 F.2d 118, 122-23 (4th Cir 1991) (finding that inconsistent reasons were probative of pretext).

          Moreover, apart from the evidence of the falsity of the Agency's proffered justification for not hiring Mr. Almutairi, there exists a multitude of other evidence upon which a reasonably jury could rely to find that the Agency's proffered justification was a pretext for discrimination.  First, there is considerable evidence of prior instances of discrimination.  *See Morgan*, 536 U.S. at 113 (prior instances of discrimination may be used as evidence in an employment discrimination case); *Bosse v. Baltimore Co.*, No. PWG-09-050, 2010 WL 816633, at *6 (D. Md. March 10, 2010).  Mr. Almutairi has provided direct evidence of discriminatory animus in the form of Mr. Nassif's explicit remark in June 2003 that "We don't need people with disabilities here."  (Am. Compl. ¶ 15; Almutairi Decl. ¶ 11.)  The jury could consider, as evidence that the Agency's decision to reject Mr. Almutairi's March 2004 Application was pretextual, the way in which it also treated his June 2003 Application.  Most notably, the jury could consider the series of false and shifting excuses that the Agency fed Mr. Almutairi after giving him a conditional job offer and telling him to get a security clearance:  (i) there was an issue with Mr. Almutairi's security clearance, even though it had been approved without any problems; (ii) that there were unspecified "reservations" about him that the Agency refused to discuss; (iii) that Mr. Almutairi could not be hired because it was against the Agency's internal policy to hire two individuals from the same family, even though many other individuals at Radio Sawa—including then-Managing Editor Mr. Nassif—worked alongside their respective family members; (iv) and that Mr. Almutairi was not hired in June 2003 because he applied only as a POV contractor and was overqualified for that job,

even though Mr. Almutairi in fact had applied for a GS-12 IRB position.  The jury may find particularly distressing Mr. Nasser's inconsistent and irreconcilable positions during the administrative proceedings: first that he had interviewed Mr. Almutairi in June 2003 for a full-time position, and then later stating (after his boss had taken a different position) that he had interviewed Mr. Almutairi only for a part-time position.

Similarly, the jury can consider the Agency's suspect justification for its rejections of Mr. Almutairi's October 2003 and December 2003 Applications.  In one instance, for example, the Agency claimed that a particular vacancy announcement never existed (Def.'s Br. 11 n.5), even though the Agency specifically rejected Mr. Almutairi under that announcement (Am. Compl. ¶ 25; Almutairi Decl. Ex. 5 [Letter from Ms. King to Mr. Almutairi (Oct. 24, 2003)] at 1 (rejecting Mr. Almutairi "for the position of a International Radio Broadcaster (Arabic), GS-1001-12, advertised under vacancy announcement M/P-03-177A).)  In another, the Agency claimed that a vacancy announcement was closed (Am. Compl. ¶ 28), even though the vacancy announcement was posted nearly a month after the alleged closing date (*id.* at ¶ 27; Almutairi Decl. ¶ 15; Almutairi Decl. Ex. 5 at 1).

Second, the jury could take into account procedural irregularities in the Agency's hiring practices, which may provide evidence of pretext in an employment discrimination case.  *See Dennis*, 290 F.3d at 647.  The Agency's hiring procedures provide that hiring officials should conduct interviews, clearly stating that "Face-to-face interviews of all highly qualified candidates always is preferred; however, the time and expense involved may often require a more practical approach.  In such cases, the preferred second option is the interview by telephone, followed by reference checks, and an in-person interview only for the one or two finalist candidates.  *Only in the rarest budgetary or operational emergency should a final offer of employment be extended without benefit of a face-to-face*

*interview.*"  (Almutairi Decl. Ex. 21 [Guidance for Conducting Effective Recruitment, Interviews ad

[sic] Reference Checks] at 2 (emphasis added).)  Here, however, Mr. Nassif decided without explanation

to "not conduct interviews," even with the finalist candidates.  (Def.'s Br. 16; Almutairi Decl. Ex. 16

[Affidavit of Daniel Nassif (July 30, 2004)] at 3).  The jury may take into account that his hiring

decision was made in contravention of the Agency's own policies.

   Third, a reasonable jury could find evidence of pretext in the fact that the Agency

overplayed Ms. Abuzaid's qualifications.  *See Dennis*, 290 F.3d at 647.  Mr. Nassif stated, on the basis

of their resumes, that Mr. Almutairi's professional broadcasting background was not as varied and broad

as Ms. Abuzaid's.  (Almutairi Decl. Ex. 16 at 3-4.)  A review of the resumes indicates that the opposite

is true: Ms. Abuzaid's only professional broadcasting experience was her two years as an IRB at Radio

Sawa.[16]  (*See* Def.'s Br. Ex. 17 at 1.)  Other than her jobs at Radio Sawa/Voice of America, the only

other journalistic experience listed on her resume was her summer college job as a researcher at a

newspaper.  (*Id.*)  In contrast, Mr. Almutairi's broadcasting experience included positions with several

leading news organizations: he served as a correspondent for the BBC in Yemen for seven years, as a

contributor for *Al Arabia* Satellite TV in 2003, as well as a writer for *Al Jazeera* in 2000.  (Almutairi

Decl. Ex. 19 at 2-3.)  Additionally, he worked at a number of radio and television stations in Yemen, and

has also served as the publisher and the editor-in-chief of *Alsiasa* Publishing House in Yemen and as an

editor at Yemen's first English newspaper.  (*Id.*)  He has written and published articles for numerous

---

[16] Although Ms. Abuzaid's resume also lists herself as an IRB at Voice of America from 1993 to 2002, the description of her duties indicates that she was not acting as a broadcaster.  (*See* Def.'s Br. Ex. 17 at 1-2.)  Furthermore, discovery conducted in the *Abdelkarim* case revealed that Ms. Abuzaid was only employed as a *producer* at VOA, and that she did not become an IRB *until 2001*.  (*See* McLaughlin Decl. Ex. 10 [*Abdelkarim v. Tomlinson*, Civ. Action No. 05-1783 (EGS) (D.D.C.), Paper No. 42 (July 16, 2008)] at 33-34.)  At the very least, this creates a question of fact as to the true nature of Ms. Abuzaid's qualifications.

newspapers and magazines, including *al-Maserah* and *al-Fajer* in London, the *Middle East Today Newsletter* in Washington, D.C., *al-Bayan* in Dubai, *al-Siasa* in Kuwait, *al-Siasa* in Sudan, and *Yemen Call* in Yemen.  (*Id.* at 2.)  Unlike Ms. Abuzaid, he has bachelor's and master's degrees in journalism.  (*Id.* at 3.)

Further, the vacancy announcement for the GS-12 IRB position listed as a requirement a knowledge of the history and culture, as well as the political, economic and social development, of the Middle East.  Mr. Almutairi grew up in Yemen and had spent six years there obtaining journalism degrees; he had nine years of experience reporting on location in the Middle East; and he had another eight years writing about the region from Washington, D.C.  His resume reflects a network of contacts throughout the region.[17]  By contrast, Ms. Abuzaid had spent her entire career as a journalist at Radio Sawa/Voice of America (mostly as a producer) in Washington, D.C.  Her educational background was in African and Caribbean history, and her resume does not even indicate whether she had ever actually been to the Middle East.

In short, the claim that Mr. Almutairi's professional broadcasting experience is not as varied and broad as Ms. Abuzaid's is untenable on its face.  And, in fact, the Agency makes no effort to support Mr. Nassif's assertion, suggesting instead only that an "employer is free to create its own standards."  (*Id.* at 17.)  At the very least, Mr. Almutairi has raised genuine issues of material fact as to whether his professional broadcasting experience is more "broad and varied" than Ms. Abuzaid's.  A reasonable jury could determine that: (1) Mr. Almutairi was significantly more qualified than Ms. Abuzaid and that the Agency's assertions to the contrary are evidence of pretext for discrimination; and

---

[17] Indeed, one of the individuals employed as a GS-12 IRB at Radio Sawa in 2004 had actually sought to work *for* Mr. Almutairi in the early 1990s at the *Alsiasa* Publishing House, where Mr. Almutairi served as editor-in-chief.  (*See* Almutairi Decl. ¶ 23.)

(2) the Agency's claim that it hired Ms. Abuzaid was thus "calculated to disguise its act of discrimination toward the plaintiff." *See Brown*, 159 F.3d at 905-06.

Finally, a reasonable jury could consider the evidence demonstrating that the Agency has discriminated against others on similar grounds in determining whether the Agency's proffered justification for rejecting Mr. Almutairi was pretextual. *See Buckley v. Mukasey*, 538 F.3d 306, 319-20 & n.15 (4th Cir. 2008). As noted above, the OIG found in a draft report that there was a disproportionate presence of Lebanese employees at Radio Sawa and concluded that "the Radio Sawa hiring process may have been marred by favoritism toward Lebanese candidates or candidates of Lebanese ancestry." (McLaughlin Decl. Ex. 2 at 54-55.) Agency officials have been accused in the media of "fill[ing] the newsroom largely with inexperienced Christian Lebanese reporters hired in [the hiring official's] native Beirut." (McLaughlin Decl. Ex. 3.) The only Yemeni IRB working at Radio Sawa during this time resigned because of discrimination (McLaughlin Decl. Ex. 5 at 110-11), and has claimed that "unfair hiring practices [at Radio Sawa] discriminated against highly qualified US citizens of Middle Eastern/Arabic background, including persons with disabilities." (Almutairi Decl. Ex. 23.) The Agency has been sued by five Egyptian and Syrian job applicants who alleged that they were discriminatorily rejected for GS-12 IRB positions at Radio Sawa on the basis of their national origin, religion, and age. (McLaughlin Decl. Ex. 6.) Even a House subcommittee convened hearings to inquire why the Agency "placed such an undue emphasis on Lebanese-Arabic speakers." (McLaughlin Decl. Ex. 1 at 54-55.)

While some of this evidence is currently in admissible form and some is not, it certainly shows the existence of genuine issues of material fact regarding whether the Agency discriminated in

favor of light-skinned, non-disabled individuals of Lebanese national-origin in its hiring decisions, and thus against dark-skinned, disabled individuals of Yemeni national origin.

**D.    Alternatively, Mr. Almutairi Should Be Given An Opportunity To Conduct Discovery Before The Court Addresses The Agency's Motion For Summary Judgment.**

At a minimum, the Court should afford Mr. Almutairi the opportunity to conduct discovery before it addresses the Agency's summary judgment motion.  Mr. Almutairi has had no opportunity to conduct discovery in this case.  There has not even been a Rule 26(f) scheduling conference.  "Generally, a district court must refuse summary judgment 'where the nonmoving party has not had the opportunity to discover information that is essential to [his] opposition.'"  *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008) (citing *Anderson*, 477 U.S. at 250 n. 5).  "If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a Rule 56(f) affidavit stating "that it could not properly oppose a motion for summary judgment without a chance to conduct discovery."  *Harrods Ltd. V. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir. 2002).

As detailed in the attached Rule 56(f) affidavit, Mr. Almutairi needs the opportunity to depose Messrs. Harb, Nassif, and Nasser, as well as Ms. King and Ms. Abuzaid, all of whom were involved in the relevant employment decisions and vacancy announcements.  There may be others at the Agency who were involved whose names will be revealed through the Agency's initial disclosures or through written discovery.  In particular, counsel will need to explore the circumstances surrounding the rejection of Mr. Almutairi's various applications and the hiring of Ms. Abuzaid in 2002 and 2004.  Mr. Almutairi also will need to learn the identity of others in or outside the Agency with relevant knowledge

of the Agency's hiring practices and procedures, who may have relevant knowledge about pro-Lebanese

bias and about hiring statistics and patterns.  Those individuals will be deposed as well.

> Mr. Almutairi also must propound interrogatories and request to inspect and copy

Agency documents and electronically stored information that relate to: employment applications made

by—and the Agency's consideration of and decision regarding each application—Mr. Almutairi, Ms.

Abuzaid, and Mr. Abdelkarim, among others; the circumstances regarding the departure from Radio

Sawa of Mr. Mawari, among others; Agency employment and hiring practices generally, and

specifically relating to any vacancy announcements for GS-12 IRB positions during the relevant period;

and allegations of discrimination on the basis of color, national origin, or disability, including but not

limited to: findings in the draft OIG report, media reports, the House Subcommittee hearings, and the

resignation or firing of Agency employees, or the failure to hire applicants, on these bases.

> This discovery would be necessary to provide evidence relevant to the following genuine

issues of material fact, among others:

(a)    Whether Agency hiring officials regarded Mr. Almutairi as disabled;

(b)    Whether the Agency initially claimed in the summer of 2003 that there had been a problem with Mr. Almutairi's security clearance;

(c)    Whether there had been any problem with Mr. Almutairi's security clearance;

(d)    Whether Agency policies forbid two individuals from the same family from working in the same location;

(e)    Whether any Agency employees worked in the same location with their respective family members;

(f)    Whether Mr. Almutairi applied, and whether the Agency considered Mr. Almutairi, for a full-time GS-12 IRB position beginning in or around June 2003, under Vacancy Announcement M/P-03-02 or otherwise; whether the Agency rejected Mr. Almutairi for that position in March 2004 and, if so, when was the effective date of the rejection; when was Mr. Almutairi informed of the rejection;

(g)     Whether, when and under what circumstances the Agency considered Mr. Almutairi's various applications for IRB positions at Radio Sawa; who considered those applications; and why the Agency rejected each of those applications;

(h)     Whether multiple positions were advertised and/or filled under Vacancy Announcement M/P-03-02; and whether the individuals hired under that Vacancy Announcement were disproportionately light-skinned, non-disabled, or Lebanese, relevant to the qualified applicant pool;

(i)     Whether the Agency issued Vacancy Announcement M/P-03-177A;

(j)     Whether the Agency considered or hired any applicants under Vacancy Announcement M/P-03-177A;

(k)     Whether the Agency authorized the posting of Vacancy Announcement M/P-03-22 after October 22, 2003;

(l)     Whether the Agency hired Ms. Abuzaid as a GS-12 IRB at Radio Sawa under Vacancy Announcement M/P-02-41 in 2002;

(m)     Whether the Agency hired Ms. Abuzaid as a GS-12 IRB at Radio Sawa under Vacancy Announcement M/P-04-22 in 2004; if so, what were the circumstances and reasons for the hire;

(n)     Whether Ms. Abuzaid's background and experience was broader and more varied than Mr. Almutairi's;

(o)     Whether the Agency sought, recruited, or hired other individuals under Vacancy Announcement M/P-04-22;

(p)     Whether the Agency hired any individuals who specified their knowledge, skills, and abilities (KSAs) in their resumes and cover letters but did not include an additional, separate attachment outlining those KSAs;

(q)     Whether any procedural irregularities occurred with respect to hiring GS-12 IRBs under Vacancy Announcements M/P-03-02, M/P-03-177A, and M/P-04-22;

(r)     Whether the Agency hired less experienced individuals of Lebanese national-origin with little broadcasting experience or language skills;

(s)     Whether the Agency's hiring practices and procedures were affected by a pro-Lebanese bias;

(t)     Whether a disproportionate number of Agency employees and/or IRBs were of Lebanese national origin;

(u)     Whether any employees at the Agency, including but not limited to Mr. Mawari, Mr. Al-

Zarouni, resigned because of discrimination on the basis of color, national-origin, or disability; and

(v)    Whether any employees of or applicants for the Agency, including but not limited to Mr. Abdelkarim, experienced adverse employment actions on the basis of color, national-origin, or disability.

It is obvious that there are many genuine issues of material fact that warrant further exploration in the discovery process. Summary judgment is unlikely to ever be appropriate in this case. But at this stage, it is premature even to consider it.

## IV.    TRANSFER OF VENUE TO THE DISTRICT OF COLUMBIA WOULD ONLY ENGENDER FURTHER DELAY.

Mr. Almutairi acknowledges that when this case was originally filed—i.e. when he was acting *pro se*—venue under 42 U.S.C. § 2000e-5(f)(3) was proper in the U.S. District for the District of Columbia.

Mr. Almutairi would urge the Agency, however, to waive any objection as to venue, as this case has been languishing on this Court's docket for four years, due to Mr. Almutairi's initial *pro se* status, his unfamiliarity with the Federal Rules of Civil Procedure, and his difficulty in securing counsel. Any transfer of venue will only engender further delay. The relevant employment records may be maintained and administered in Washington, D.C., but Mr. Almutairi would ask the Agency to consider that its office is but a few miles—and a short Metro ride—away from this Court's courthouse in Greenbelt.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment. Plaintiff requests that any objection to venue be waived.

Dated:  June 28, 2010                              Respectfully submitted,


                                                   _____/s_____


                                                   William R. Stein (Bar No. 10570)
                                                   Daniel James McLaughlin (Bar No. 17851)
                                                   1775 I Street, NW
                                                   Washington, DC 20006
                                                   (202) 721 - 4600 (Tel)
                                                   (202) 721 - 4646 (Fax)
                                                   stein@hugheshubbard.com
                                                   mclaughlin@hugheshubbard.com

                                                   Attorneys for Plaintiff