## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NASSER ALMUTAIRI,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 10-1479 (JEB)** |
| **INTERNATIONAL BROADCASTING BUREAU,** *et al.*, | |
| **Defendants.** | |

### MEMORANDUM OPINION

Plaintiff Nasser Almutairi brings this suit claiming that Radio Sawa, an Arabic-language radio station housed in the federal government, twice declined to hire him based on his color, national origin, and disability.  The first time around, despite a successful interview with a supervising editor at the radio station and sparkling credentials as a journalist, Almutairi waited nine months for an answer, then was told that an anti-nepotism policy barred Radio Sawa from hiring him.  No such policy, in fact, existed, and Defendants now explain that Plaintiff was rejected as overqualified.  Almutairi reapplied.  Radio Sawa again turned down his application, this time saying that another applicant was better qualified.  In a deposition eight years later, however, the hiring supervisor claimed that Almutairi's bid had been declined largely because other journalists said he had falsified his resume.  At least one of the journalists named by the supervisor denies making such a statement.  In addition, according to Almutairi, after his interview, the same supervisor said, "We don't need more people with disabilities here."

Defendants now move for summary judgment, arguing that an array of procedural hurdles bars suit for the first rejection and that no reasonable jury could find discrimination in the

second.  In granting the Motion in part and denying it in part, the Court resists Defendants'

procedural gambits as to Plaintiff's first application, but agrees that a jury could find

discrimination only on the basis of disability, not color or national origin, as to the second.

## I.      Background

The parties dispute many facts.  As Almutairi is the nonmoving party, the Court will, in

discussing the state of the record, generally credit his evidence and draw justifiable inferences in

his favor.

### A.  Factual Background

A journalist with a long and impressive resume, Almutairi published the first English and

nongovernmental newspapers in Yemen and has worked for Al Jazeera and the BBC.  See Opp.,

Exh. 2 (Dep. of Nasser Almutairi) at 15:2-5, 34:2-38:12, 55:17-22; Opp., Exh. 11 (Decl. of

Nasser Almutairi), ¶ 6.  He is Yemeni-American and has dark skin.  See Almutairi Decl., ¶ 1.

Since a car accident in 1997, Almutairi has had trouble walking and standing.  See id., ¶ 2.  He

still walks with a limp, usually uses a brace or cane, and must pause to rest after walking short

distances.  See id.

This case concerns repeated rejections of Almutairi's employment applications by Radio

Sawa.  Radio Sawa "is a 24-hour, seven-day-a-week Arabic-language broadcast that originates

its broadcasts from studios in the Washington, D.C. area and Dubai, U.A.E."  Defs. Statement of

Material Facts (SMF), ¶ 4.  At the time Almutairi applied, Radio Sawa was part of the

Broadcasting Board of Governors, "a federal agency responsible for the U.S. Government's

international broadcasting," which "manages a network of individual broadcasting services."

Grosdidier v. Chairman, Broad. Bd. of Governors, 560 F.3d 495, 496 (D.C. Cir. 2009).[1]

---

[1] To avoid acronym overload, this Opinion will refer to only Radio Sawa and the BBG.  Other

While Almutairi applied to (and was rejected by) Radio Sawa on multiple occasions, the dispute here has narrowed to his first and last applications: June 2003 and March 2004.  The Court will discuss those two chronologically.

As a threshold matter, the parties disagree about exactly what position Almutairi applied for in June 2003.  Plaintiff asserts that, in response to Vacancy Announcement M/P-03-02 listing multiple openings, he applied to work as an Arabic-speaking "International Radio Broadcaster" – a full-fledged federal employee paid at General Schedule level 12.  See Almutairi Decl., ¶¶ 7-8; Opp., Exh. 6 (BBG, Vacancy Announcement (Jan. 2003)).  The Government, on the other hand, contends that Almutairi applied to work as a Purchase Order Vendor.  See King Decl., ¶ 7; Mot., Exh. 8 (Decl. of Bernard Kotarski), ¶ 4; Opp., Exh. 8 (Decl. of Munir Nasser), ¶ 15.  While some POVs performed similar tasks to IRBs, they earned less and were classified as contractors instead of federal employees.  See King Decl., ¶ 7; Nasser Decl., ¶¶ 4-7.  Within the POVs, furthermore, it seems there was a subordinate distinction between broadcaster POVs, who were like IRBs with more supervision, and technical POVs, who had more mechanical tasks.  See Dep. of Daniel Nassif at 17:4-18:22.[2]  That distinction proves important in this case because the

---

related and subsidiary entities still come up in the citations, in prior opinions, and in the caption. According to the First Amended Complaint and the Answer, here is how those various entities connect: The BBG is the federal agency at the top.  It contains the International Broadcasting Bureau, which in turn contains the Voice of America.  Until 2002, the Voice of America handled the Arabic-language broadcasting services.  Those services were then transferred to the Middle East Radio Network, which was also stuck under the International Broadcasting Bureau.  The Middle East Radio Network broadcast under the name "Radio Sawa."  In other words, Radio Sawa and the Middle East Radio Network are the same entity.  See generally First Amended Compl., ¶¶ 4-5 & n.2; Answer, ¶¶ 4-5.  "In 2005, Radio Sawa became part of the Middle East Broadcasting Network, a private, non-profit grantee organization of the BBG, and was no longer a part of the Agency."  Mot., Exh. 7 (Decl. of Susan King), ¶ 4.

Two Defendants are named here: the International Broadcasting Bureau and the Chairman of the BBG.  See First Amended Compl. at 1 & n.1.  Walter Isaacson was the Chairman until he resigned on January 27, 2012, and since then that position has been vacant.  See Mot. at 1 n.1.  In the Order accompanying this Opinion, the Court will accordingly substitute "Chairman, Broadcasting Board of Governors" for Isaacson in the caption.  See Fed. R. Civ. P. 25(d).

[2] Nassif's deposition is split across the parties' filings, with Exhibit 13 to the Government's Motion and Exhibit 5 to Plaintiff's Opposition both containing excerpts.

Government maintains that Almutairi applied for only a technical POV position, while Plaintiff argues that he at least applied for a broadcaster POV position (if not an IRB position).  Compare Nassif Dep. at 121:11-12 ("Mr. Almutairi never applied for a broadcasting POV."), with Nasser Decl., ¶¶ 4-7, 14-15 (suggesting Almutairi, if hired, would have performed tasks of broadcaster POV).

Whatever job he applied for in June 2003, Radio Sawa granted him an interview. Almutairi went to Radio Sawa's D.C. office on June 12 and met with Munir Nasser, the acting supervisor of the Radio Sawa Internet Unit.  See Almutairi Decl., ¶ 8; Nasser Decl., ¶¶ 3, 16. That Unit prepared news content for www.radiosawa.com, and its staff included a mix of IRBs and POVs.  See Nasser Decl., ¶¶ 3-7.  Nasser concluded that Almutairi "was perfectly suited for this position and that he should be hired," id., ¶ 16, and – according to Almutairi – Nasser gave "a conditional offer of employment, subject to [his] obtaining the obligatory security clearance." Almutairi Decl., ¶ 8; see also Nasser Decl., ¶ 17 ("It was my belief that Mr. Almutairi would be offered the position officially once he successfully obtained a security clearance.").  Almutairi returned to Radio Sawa's office around July 2003, where Nasser introduced Almutairi to Radio Sawa's managing editor, Daniel Nassif.  See Almutairi Decl., ¶ 11.  According to Almutairi, as he was walking away, he heard Nassif tell Nasser, "'We don't need more people with disabilities here.'"  Id., ¶ 11.

The security office eventually cleared Almutairi.  See Nasser Decl., ¶ 18.  Radio Sawa, however, lost interest in him.  In late August, Nasser told Almutairi that management had doubts about hiring him, and that Nasser would call when the issue was resolved.  See Almutairi Decl., ¶ 13.  In the interim, Almutairi applied for IRB positions at Radio Sawa (twice in October 2003 and once in December 2003).  Radio Sawa rejected each submission without delay.  See id., ¶ 15.

Not until March 2004, however, was Almutairi told that his June 2003 application had not succeeded. Nasser left Almutairi a voicemail explaining that a Radio Sawa policy prohibited family members from working together, and that because Almutairi's son was a technical POV, Radio Sawa had to decline Almutairi's June 2003 application. See Almutairi Decl., ¶ 16; Nasser Decl., ¶ 21. Nasser learned of the policy from Nassif. See Nasser Decl., ¶¶ 18-21; see also Answer, ¶ 20 (admitting as much). The problem, however, is that Radio Sawa had no such policy, see Opp., Exh. 12 (Dep. of Susan King) at 47:11-48:14, and Nassif now admits that the decision not to hire Almutairi was not based on an anti-nepotism policy. See Nassif Dep. at 53:2-9. Instead, Nassif asserts that Almutairi's June 2003 application was unsuccessful because Almutairi had applied for only a technical POV job, for which he was overqualified. See id. at 57:1-19.

Less than a week after this latest rejection, Almutairi applied for another job at Radio Sawa. See Almutairi Decl., ¶ 18. This time, there is no dispute that Almutairi applied for an IRB position (responding to Vacancy Number M/P-04-22). See Defs. SMF, ¶ 25; Almutairi Decl., ¶ 18. According to the Government, Radio Sawa received Almutairi's application on March 23, the application deadline closed on March 24, and Nassif rejected Almutairi and selected Zahrat Abuzaid on March 25. See Defs. SMF, ¶¶ 25-26, 28. Abuzaid has dark skin, is from Sudan, and is not disabled. See Nassif Dep. at 73:22-74:1; Mot., Exh. 19 (Application of Zahrat Abuzaid for M/P-04-22) at 4. When she was selected, Abuzaid was already working for Radio Sawa as an IRB, performing essentially the same tasks as she would in the new position. See Application of Zahrat Abuzaid for M/P-04-22 at 1-2. Her prior position was open only to noncitizens, however, so when Abuzaid became a citizen, she had to reapply. See King Decl., ¶¶ 9-11. Nassif explained that he hired Abuzaid because she was "one of the best broadcasters

when it comes to doing multifunctional jobs," she could tell "Americana stories like nobody else," she understood Radio Sawa's "mission better than anybody," and she had a "varied and broad" broadcasting background.  Nassif Dep. at 141:8-143:7; Mot., Exh. 15 (EEO Aff. of Daniel Nassif) at 4.  He based this decision on "her experience and background as reflected in her resume" and his "own personal observation of the quality of her work since [his] arrival at Radio Sawa."  Nassif. EEO Aff. at 4.

At his deposition, Nassif gave another explanation.  He claimed that other Yemeni journalists, including Munir Mawari and Wadea Mansour, had said Almutairi was a bad journalist whose resume could not be substantiated.  See Nassif Dep. at 132:3-134:22, 139:5-141:5.  Almutairi disputes this account, providing a declaration from Mansour swearing that Nassif's testimony is "not true."  Opp., Exh. 1 (Decl. of Wadea Mansour), ¶¶ 3-4.

B.  Procedural Background

After submitting an unsuccessful complaint to the BBG's Office of Civil Rights, Almutairi filed this suit *pro se* in the U.S. District Court for the District of Maryland.  Almutairi had applied to Radio Sawa five times: twice in October 2003, and once each in June 2003, December 2003, and March 2004.  The suit alleged that each rejection constituted employment discrimination on the basis of color, national origin, age, and disability.  See Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (color and national origin); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (age); Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (disability).  After a long delay while Almutairi procured counsel and served process on Defendants, the case was transferred here.  See Almutairi v. Isaacson, No. 06-cv-1929 (D. Md. Aug. 20, 2010), ECF No. 41.  On Defendants' motion, this Court in 2011 dismissed the age-discrimination claims and all other claims related to the October and

6

December 2003 applications for Plaintiff's failure to exhaust administrative remedies.  <u>See</u> <u>Almutairi v. Int'l Broad. Bureau</u> (<u>Almutairi I</u>), No. 10-1479 (D.D.C. Oct. 3, 2011), ECF No. 56. Surviving were the claims for failure to hire on the basis of color, national origin, and disability following Almutairi's June 2003 and March 2004 applications.

With discovery complete, the Government has now filed another Motion.  While styled a "Motion to Dismiss or, in the Alternative, for Summary Judgment," it brims with record citations outside the pleadings.  The Motion, therefore, "must be treated as one for summary judgment under Rule 56" and not one to dismiss under Rule 12(b)(6).  Fed. R. Civ. Pro. 12(d).

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor."

Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006);

Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for

summary judgment, the Court must "eschew making credibility determinations or weighing the

evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham

v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is "merely

colorable" or "not significantly probative," summary judgment may be granted.  Liberty Lobby,

477 U.S. at 249-50.

## III.    Analysis

Under Title VII, federal agencies must make "[a]ll personnel actions affecting employees

or applicants for employment . . . free from any discrimination based on race, color, religion, sex,

or national origin."  42 U.S.C. § 2000e-16(a).  The Rehabilitation Act similarly prohibits

discrimination based on disability.  See Kapche v. Holder, 677 F.3d 454, 460 (D.C. Cir. 2012).

When alleging that he was not hired for discriminatory reasons, a plaintiff establishes a

prima facie case by showing that "(i) [he] 'belongs to a racial minority' or other protected class;

(ii) [he] 'applied and was qualified for a job for which the employer was seeking applicants'; (iii)

despite [his] qualifications, [he] 'was rejected'; and (iv) after the rejection, 'the position

remained open and the employer continued to seek applicants from persons of complainant's

qualifications.'"  Brady v. Office of Sergeant of Arms, 520 F.3d 490, 493 n.1 (D.C. Cir. 2008)

(quoting <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)).  Both parties here

wrongly assume that the *prima facie* case also requires showing that the employer ultimately

hired someone outside the plaintiff's protected class.  Despite some ambiguous Circuit language,

there is no such requirement.  <u>See</u> <u>Stella v. Mineta</u>, 284 F.3d 135, 146 (D.C. Cir. 2002).

   "[W]here an employee has suffered an adverse employment action and an employer has

asserted a legitimate, non-discriminatory reason" for its decision, however, a court "need not –

<u>and should not</u> –" consider whether the plaintiff has made out a *prima facie* case under

<u>McDonnell Douglas</u>.  <u>Brady</u>, 520 F.3d at 494 (emphasis in original).  Rather, a simpler analysis

governs:

> [I]n considering an employer's motion for summary judgment or
> judgment as a matter of law in those circumstances, the district
> court must resolve one central question: Has the employee
> produced sufficient evidence for a reasonable jury to find that the
> employer's asserted non-discriminatory reason was not the actual
> reason and that the employer intentionally discriminated against
> the employee on the basis of race, color, religion, sex, or national
> origin?

<u>Id.</u>; <u>see also</u> <u>Kersey v. WMATA</u>, 586 F.3d 13, 16-17 & nn.1-2 (D.C. Cir. 2009) (same

framework governs claims under Rehabilitation Act).

   The resolution of this "one central question" determines the outcome of the

Government's challenge to Almutairi's claims respecting his March 2004 application.  Before

addressing that, the Court considers Plaintiff's claims based on his June 2003 application, which

the Government attacks for a host of reasons unrelated to the <u>Brady</u> inquiry.

   A.   <u>June 2003 Application</u>

   As already noted, the parties diverge on what job Almutairi actually applied for in June

2003.  The Government maintains that he applied and interviewed not for an IRB position, but

for a POV position – specifically, a technical POV position.  Almutairi disagrees, but argues that

even if he had applied for a POV position, his discrimination claims would survive.  The Court

will first consider the evidence regarding the different jobs.  Then, assuming a jury finds he only

applied for a POV position, the Court will sequentially address the hurdles he faces: Almutairi

must show that the POV issue was not raised too late in this suit, that he exhausted his

administrative remedies as to that job, and that the job qualifies for statutory protection.

### 1.   *Evidence of Application for IRB Position*

Our starting point is whether Almutairi applied for the IRB position.  In the current

procedural posture, the Court must avoid determining credibility or weighing evidence, so

Almutairi's IRB claim survives as long as a reasonable jury could resolve this issue in his favor.

See Liberty Lobby, 477 U.S. at 249-50, 255.

Although the Government undeniably marshals facts suggesting that Almutairi applied

only for the POV position, two compelling pieces of evidence indicate that he applied for the

IRB job, precluding summary judgment on this point.  First, Almutairi has produced a job-

vacancy announcement – "the only announcement for any job in that organization" that he ever

saw, according to Almutairi, and the announcement that he replied to in June 2003.  See

Almutairi Dep. at 112:10-21, 116:19-23.  It announces a vacant IRB job, not a POV job.  See

BBG, Vacancy Announcement at 1.  Second, Almutairi offers a declaration from Nasser, who

interviewed Almutairi after his June 2003 application.  See Nasser Decl., ¶¶ 7, 9, 15-16.  Nasser

believed that Almutairi's application "was sent directly to human resources," id., ¶ 15; see also

Almutairi Decl., ¶ 7 – the process for IRB positions, but not for POV positions.  See King Dep.

at 32:9-20; BBG, Vacancy Announcement at 6 (directing applications to BBG's office of

personnel).  While Nasser had "assumed" that Almutairi would be classified as a POV if hired,

they never discussed the issue, and Nasser allowed that "[i]t is possible that Mr. Almutairi's

application referenced the IRB position at the time."  Nasser Decl., ¶ 15.  Because the evidence here goes beyond the "conclusory statements" that a court may discount at this stage, cf. Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp., 564 F.3d 462, 465 (D.C. Cir. 2009), the Court concludes that there is a genuine factual dispute over whether Almutairi applied for an IRB position.

There is also a material dispute of fact about whether, assuming Almutairi did apply for a POV position, he would have been a broadcaster or technical POV.  Nassif testified that "Mr. Almutairi never applied for a broadcasting POV."  Nassif Dep. at 121:11-12.  Nasser, on the other hand, explained that the POVs on his "team" (which would include Almutairi, if hired as a POV) "prepared and produced news materials and articles by reporting, writing, and editing stories for publication on the Radio Sawa website."  Nasser Decl., ¶ 6; see also id., ¶¶ 14-15 ("If he had been hired in this position, Mr. Almutairi would have worked on site, on a full-time basis, and under my direct supervision.").  The tasks Nasser describes are those of broadcaster POVs, not technical POVs.  See, e.g., Nassif Dep. at 17:15-18:14.

If the case goes to trial and Almutairi prevails, damages will depend on which position Almutairi actually applied for.  Because the evidence here could support a finding that he applied to work as an IRB, a broadcaster POV, or a technical POV, a jury must resolve the issue.

2.   *Tardiness of POV Discrimination Claim*

The Court next asks whether Almutairi is too late in claiming discrimination for not being selected for the POV job – in the event a jury were to find that was the job he had applied for. Although the Government never explicitly objected on this ground, the question is worth addressing given Almutairi I's assumption that "Plaintiff does not assert a claim relating to the POV position in this case."  Almutairi I at 6; see also Opp. at 22-23 (discussing issue).

Even if it appears nowhere in a complaint, a claim may be raised for the first time in an

opposition to a motion for summary judgment as long as it is "substantially similar" to a claim in

the complaint and will not cause "undue prejudice."  Wiley v. Glassman, 511 F.3d 151, 159

(D.C. Cir. 2007); see also Alley v. Resolution Trust Corp., 984 F.2d 1201, 1208 (D.C. Cir.

1993).  As Wright and Miller explain:

> The federal rules, and the decisions construing them, evince a
> belief that when a party has a valid claim, he should recover on it
> regardless of his counsel's failure to perceive the true basis of the
> claim at the pleading stage, provided always that a late shift in the
> thrust of the case will not prejudice the other party in maintaining a
> defense upon the merits.

5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1219, at 281-83 (3d

ed. 2004) (footnote omitted).

This Court noted in its previous Opinion that "Plaintiff alleges in his Amended

Complaint that he applied for a GS-12 Arabic IRB Position" in June 2003 – he "does not assert a

claim relating to the POV position in this case."  Almutairi I at 5-6.  And, indeed, in opposing the

motion to dismiss at issue in Almutairi I, Almutairi vehemently denied making a discrimination

claim as to the POV position.  See Almutairi I Opp. at 20, ECF No. 36 ("In contrast to that web

of shifting and inconsistent justifications, Mr. Almutairi has repeatedly and consistently asserted

that he applied in June 2003 for a permanent position as a GS-12 IRB and not as a POV

contractor.").  Beginning with his surreply in that briefing, however, Almutairi charted an

alternative argument: that even if he had applied for a POV job in June 2003, the failure to hire

him had been discriminatory.  See Almutairi I Surreply at 8, ECF No. 49 ("[E]ven if Mr.

Almutairi had applied or was considered only for a POV position, there is at least an issue of fact

at this stage of the proceedings as to whether Mr. Almutairi would have been an employee or an

independent contractor if hired."); see also Almutairi I at 3 n.1 (noting that Court considered

Almutairi's surreply).  In a declaration attached to that surreply, moreover, Almutairi detailed discovery that he wished to take in order to establish that a POV contractor is an "employee" for purposes of the discrimination statutes.  See Almutairi I Surreply, Exh. 1 (Supp. Rule 56(f) Decl. of Daniel James McLaughlin) at 2-4.  From the record now before the Court, it is clear that he then sought extensive discovery about POV contractors from the Government.

At least since the surreply preceding Almutairi I, then, the Government has been on notice that Almutairi would claim in the alternative that his nonselection for the POV job after his June 2003 application constituted actionable discrimination.  To be sure, the better course would have been for Almutairi to amend his Complaint when he decided to make such a claim. The Government, however, is not unduly prejudiced by his shift in legal theories.  All discovery took place after Almutairi I.  The POV discrimination claim, moreover, is substantially similar to the IRB discrimination claim in the Amended Complaint.  Indeed, the facts are essentially the same – the same June 2003 application, the same interview with the same people, and the same decision not to hire him.  The claim can thus proceed to face the Government's arsenal of other challenges.

3.  *Exhaustion for POV Position*

The Government next asserts that, even if permitted to proceed on his POV claim, Almutairi failed to administratively exhaust his grievance about that position.  An applicant for federal employment who believes that an agency discriminated against him must consult an Equal Employment Opportunity Counselor "within 45 days of the date of the matter alleged to be discriminatory" in order to "try to informally resolve the matter."  29 C.F.R. § 1614.105(a)(1); see also Steele v. Schafer, 535 F.3d 689, 693 (D.C. Cir. 2008).  A suit that follows such a consultation "is limited in scope to claims that are like or reasonably related to the allegations of

the charge and growing out of such allegations." Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks omitted); see also Wiley, 511 F.3d at 160.  In deciding whether new allegations are "like or reasonably related" to ones made to the agency, the D.C. Circuit has looked to whether the agency was "put . . . on notice of the matter" and thus given "an opportunity to resolve [the employee's] claim administratively before she filed her complaint in district court." Weber v. Battista, 494 F.3d 179, 184 (D.C. Cir. 2007); see also Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010).  The Seventh Circuit "has held that in order for claims to be deemed related, the EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals." Teal v. Potter, 559 F.3d 687, 692 (7th Cir. 2009) (emphasis in original) (internal quotation marks omitted).

Here, the Government argues that the complaint with the BBG's Office of Civil Rights related only to the IRB job, and thus any challenge to the POV hiring decisions must be dismissed on exhaustion grounds.  Almutairi's administrative complaint, however, never drew that firm distinction between the positions and, indeed, never specified any particular job sought. See Almutairi I Opp., Exh. 12 (Nasser Almutairi, Complaint of Discrimination (Apr. 26, 2004)) at 2 ("For almost a year now, and in good, sincere faith I have tried to get an editorial position with the IBB (Radio Sawa[]) . . . .").  And the counselor's report that resulted from that complaint makes clear that the BBG investigated the general decision not to hire Almutairi.  See Opp., Exh. 17 (Debbie Young, BBG EEO Counselor's Report (June 4, 2004)) at 3-5.  Even that report reflects early uncertainty about the job Almutairi applied for.  See, e.g., id. at 4 ("Ms. King [Radio Sawa's personnel specialist] stated that the Complainant might be confused about the procedures in the processing of outside applications for employment verses [sic] employment as a Purchase Order Vendor (POV).").  While the discrimination complaint that the BBG later

14

accepted for processing listed the IRB vacancy-announcement number, see Mot., Exh. 1 (Letter

from BBG to Nasser Almutairi (June 17, 2004)), nothing suggests that the BBG investigation

fixated on the IRB position while ignoring the POV position.

The essential facts, moreover, are the same no matter what the position: Almutairi

applied in June 2003; he was interviewed by Nasser; he claims he heard Nassif say, "We don't

need more people with disabilities here"; he was told in March 2004 that he had not been

selected; and he alleges that the stated reasons for his nonselection were bogus.  The BBG had

notice of these facts and was able to investigate the denial of his June 2003 application.  Under

D.C. Circuit precedent, Almutairi thus exhausted his discrimination claim arising out of this

application, whatever the position he officially interviewed for.

### 4.  *Eligibility of POV Position for Statutory Protection*

Moving beyond these procedural hurdles, the Government next argues that a POV is not

an "employee" of the BBG for purposes of Title VII and the Rehabilitation Act.  These statutes

allow discrimination suits only by "employees or applicants for employment," not applicants for

independent-contractor positions.  42 U.S.C. § 2000e-16(a); see 29 U.S.C. § 794a(a)(1); see also

Spirides v. Reinhardt, 613 F.2d 826, 829-30 (D.C. Cir. 1979) (Title VII); Redd v. Summers, 232

F.3d 933, 937 (D.C. Cir. 2000) (Rehabilitation Act).  If the jury were to find Plaintiff had applied

for a POV position, the Government posits, this would preclude recovery.

To decide whether someone is an "employee" who can sue the agency or an independent

contractor who should be suing someone else, the D.C. Circuit has – helpfully – come up with a

twelve-factor test.  See Spirides, 613 F.2d at 831-32.  The "most important factor" is "the extent

of the employer's right to control the 'means and manner' of the worker's performance."  Id. at

831.  The eleven remaining factors fall into four groups:

The first we see as comprised of a single factor: (11) the intent of the parties, primarily as reflected in the contract between the "contractor" and its "client" (here the Bureau).  As the <u>Spirides</u> court noted, of course, the intent of the parties alone cannot "waive protections granted to an individual under . . . any act of Congress." . . .

The second group of factors can be seen as addressing whether contracting out work is justifiable as a prudent business decision: (1) whether supervision of the contractor by the client is required; (2) whether the contractor's work does not require special skills; and (8) whether the work performed by the contractor is an integral part of the client's business.  An affirmative answer to these questions may call into question the business bona fides of the decision to hire an independent contractor, possibly suggesting a purpose to circumvent rights afforded to employees. . . .

If hiring independent contractors cannot be dismissed as an implausible business decision, it is sensible to turn to a third group of factors, which seem to renew the question of the client's control over the work (which, we recall, is in a sense the ultimate determinant): (3) whether the client furnishes the equipment used and place of work; and (6) the manner in which the work relationship was terminated.  Here the inquiry is whether the business is exercising a degree of control that seems excessive in comparison to a reasonable client-contractor relationship in the same circumstances. . . .

The final group of factors appears to ask whether the relationship shares attributes commonly found in arrangements with independent contractors or with employees: (4) the duration of the engagement; (5) the method of payment; (7) whether annual leave is afforded; (9) whether the worker accumulates retirement benefits; and (10) whether the client pays social security taxes. Employment relationships tend to be longer or at any rate more likely of indefinite length, to afford annual leave and retirement payments, and to assign payment of social security taxes to the employer.

<u>Redd</u>, 232 F.3d at 939-40 (first omission in original).

Citing other D.C. district court cases, the Government preliminarily argues that this Court may ignore the <u>Spirides</u> factors because those courts have "long and consistently held that POV positions within the BBG are independent contractors rather than employees."  Mot. at 13 (citing

<u>Khaksari v. Chairman, Broad. Bd. of Governors</u>, 689 F. Supp. 2d 87, 91-92 (D.D.C. 2010);

Zhengxing v. Nathanson, 215 F. Supp. 2d 114, 117-20 (D.D.C. 2002); Spirides v. Reinhardt, 486 F. Supp. 685, 687-88 (D.D.C. 1980) (decision after remand)).  Of course, these decisions are not binding here; it is precedent of the Circuit and the Supreme Court that ties this Court's hands.  In any event, each case that the Government cites applies the Spirides test to reach its answer.  POV jobs, moreover, are not identical (or even, necessarily, similar); each case, in finding the disputed POV job to be an independent contractor instead of an employee, relied on facts particular to that position.  See, e.g., Khaksari, 689 F. Supp. 2d at 91 ("Khaksari was hired under a POV contract, based on her specialized language skills, for the purpose of performing translations for the BBG.").  None of the cases suggests that all BBG POVs are independent contractors.  The Court must thus work through the Spirides factors here.

Unfortunately, the parties have made that task more difficult by failing to brief the proper questions.  The Government disdains (even in its Reply) any discussion of the Spirides factors.  While the Court does not treat the issue as conceded, Plaintiff begins with the advantage: the Spirides test "calls for application of general principles of law of agency to undisputed or established facts," 613 F.2d at 831, and Almutairi is the only party who has matched the Spirides factors to such facts about a POV job here.  Plaintiff, on the other hand, exclusively discusses the broadcaster POV position.  As there is no evidence either way about technical POVs, the Court must reserve judgment on whether the latter were "employees."  Almutairi has, however, presented adequate evidence to resolve the status of the former position, relying almost exclusively on sworn statements by Radio Sawa supervisors.

The most important factor – the employer's right to control the means and manner of the worker's performance – tips in favor of Almutairi.  "If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details

by which that result is achieved, an employer/employee relationship is likely to exist." Id. at 831-32. Here, there was extensive supervision of the broadcaster POVs – indeed, these POVs were supervised even more closely than the Agency's comparable employees, the IRBs. Shift editors would select stories for the broadcaster POVs, while IRBs had "independent judgment" to pick their own. See Nassif Dep. at 35:7-36:8, 37:1-12, 38:11-22. Shift editors or IRBs would edit stories by broadcaster POVs before publication. See id. at 37:13-38:5. Further, apparently like the IRBs, the work of broadcaster POVs would be reviewed daily. See id. at 36:9-17; see also Nasser Decl., ¶ 7 ("As supervisor of the website team, I reviewed the work of all of the broadcasters, writers, and editors (both IRBs and POVs) on a daily basis."). Radio Sawa, in sum, pervasively controlled the means and manner of broadcaster POVs' performance.

Moving to the other Spirides factors, the first group – the intent of the parties – seems to favor the Government. While the contract is not before the Court, it is clear that at least Radio Sawa intended for the POVs to be "contractors," as opposed to permanent IRB employees. See, e.g., King Decl., ¶ 7. The Redd court noted, however, that the "intent to make the individual an employee of the client is more likely to prove the relationship than the opposite intent is to disprove it" because "the intent of the parties alone cannot waive protections granted to an individual under any act of Congress." 232 F.3d at 939 (ellipsis and internal quotation marks omitted). So the intent to make broadcaster POVs contractors proves relatively unimportant in the overall balancing.

The next group of factors addresses whether contracting work out is a prudent business decision for the agency. That inquiry looks at whether the position has traits traditionally associated with independent contractors – minimal supervision, special skills, and work that is not integral to the employer's business. Each of those factors cuts against the Government here.

As discussed above, the broadcaster POVs essentially do the same things as IRBs – that is, they write news stories for the news website – with the difference being that they are supervised slightly <u>more</u>.  <u>See</u> Nasser Decl., ¶¶ 4-7; Nassif Dep. at 35:9-38:22.  So each factor in the second group tilts the scales toward Almutairi.

The third group of <u>Spirides</u> factors – how the work relationship is terminated and who furnishes the equipment and the place of work – swings the focus back to the pivotal issue of control.  As phrased by the D.C. Circuit, this third group may not come into play in cases like this one where the second group favors the employee.  <u>See</u> <u>Redd</u>, 232 F.3d at 939 ("<u>If</u> hiring independent contractors cannot be dismissed as an implausible business decision, it is sensible to turn to a third group of factors . . . .") (emphasis added).  Even if these factors should be considered, however, they prove trivial in this balancing.  There is no evidence at all about how broadcaster POVs are terminated.  And while Radio Sawa provided office space and equipment, <u>see</u> Almutairi Decl., ¶ 10; Nasser Decl., ¶ 14; Opp., Exh. 16 (Dep. of Cheryl J. Nixon) at 84:14-85:15, the D.C. Circuit has said that such evidence "proves little."  <u>Redd</u>, 232 F.3d at 940.

Finally, the fourth group asks whether the relationship looks more like a typical arrangement with an independent contractor or with an employee.  Once again, Almutairi presents minimal evidence about key factors like annual leave, benefits, how the broadcaster POVs are paid, who pays social security taxes, and how long the jobs last.  In the Court's estimation, however, such facts about the structure of the contract here would not overcome the pervasive control that Radio Sawa supervisors exercise over the broadcaster POVs.  In the final balancing, the Court thus concludes that the broadcaster POVs are BBG "employees" for purposes of Title VII and the Rehabilitation Act.  Even if Almutairi was rejected for the broadcaster POV position instead of the IRB position, therefore, the BBG is the proper defendant

for his suit.  (The Court assumes that the technical POV position would yield a similar analysis, but as noted at the outset, that question remains open.)

   5. *Conclusion*

   The Government's objections cease there.  It neither challenges Almutairi's *prima facie* case for the June 2003 application nor proffers a legitimate, nondiscriminatory reason for why the BBG decided not to hire him.  The claim that Radio Sawa discriminated on the basis of color, national origin, and disability when it rejected Almutairi's June 2003 application can therefore proceed to trial.  One caveat: After browsing the record, the Court has seen little evidence about what happened to the IRB or POV positions that Almutairi allegedly interviewed for.  At trial, Plaintiff must establish that vacancies actually existed.  See Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1152 (D.C. Cir. 2004) (by failing to present evidence of what happened to position, plaintiff "failed to eliminate one of the most common legitimate nondiscriminatory reasons for a failure to hire: the absence of a vacancy").

  B. March 2004 Application

   Instead of attacking the claims stemming from Almutairi's March 2004 application with procedural artillery, the Government offers a legitimate, nondiscriminatory reason for not hiring Almutairi: Radio Sawa filled the position with a more qualified candidate, Zahrat Abuzaid.  As mentioned, once an agency offers such an explanation, "the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture."  Brady, 520 F.3d at 493 (internal quotation marks and brackets omitted).  The "one central inquiry" becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and

that the employer intentionally discriminated against the plaintiff on a prohibited basis."
Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (citation omitted).

Almutairi's color and national-origin claims for the March 2004 application stumble out of the starting blocks because Abuzaid, the candidate actually hired, also has dark skin and is not Lebanese.  See Nassif Dep. at 73:22-74:1; Application of Zahrat Abuzaid for M/P-04-22 at 4. While a national-origin claim usually focuses on the country discriminated against, in this case Almutairi has focused on the country discriminated in favor of – specifically, Lebanon.  The BBG Office of Civil Rights described his national-origin complaint as "non-Lebanese."  Letter from BBG to Almutairi at 1.  And throughout his brief, Almutairi points to preferential treatment of Lebanese people.  See, e.g., Opp. at 11, 14-15, 31, 43-44.  He gives no reason to think that Radio Sawa held a particular bias against people from Yemen as opposed to another country (like Abuzaid's Sudan).  The Court thus agrees that the national-origin allegation is best categorized as a pro-Lebanese bias.  Abuzaid, therefore, falls within the same protected class as Almutairi for both the color and national-origin claims.

The D.C. Circuit has recognized that "a replacement within the same protected class cuts strongly against any inference of discrimination."  Murray v. Gilmore, 406 F.3d 708, 715 (D.C. Cir. 2005).  That is because "even if the employee shows that the asserted reason was not the actual reason for his adverse employment action, he still [has] to demonstrate that the actual reason was a discriminatory or retaliatory reason."  Gilbert v. Napolitano, 670 F.3d 258, 261 (D.C. Cir. 2012) (citation, brackets, and ellipsis omitted).  Proving discrimination to a jury turns out to be difficult unless "the slot for which he applied went to an applicant outside that class." Id.

This is not to say that showing discrimination is impossible in such circumstances.  At least for some adverse employment actions, the Circuit has recognized that exceptional facts may still allow a showing of discrimination.  See Murray, 406 F.3d at 715 ("This does not mean that a jury could never infer discrimination where the plaintiff was replaced by a member of the same protected class.  For example, suppose an employer fired ten African-American employees for pretextual reasons and replaced them with nine whites and one African American.  Under these circumstances, the employee replaced by the African American could most likely survive summary judgment on a race discrimination claim.").  The failure-to-hire context seems particularly unlikely to yield a situation where an employer rejects a person on a prohibited basis, yet hires someone else from the same protected class.  If an employer rejects someone because he has dark skin or because he is not Lebanese, it is hard to imagine the employer simultaneously filling the spot with someone else with those same scorned characteristics.  In any event, Almutairi has given no explanation of why his case is the exception.  The Court concludes here that, like in Murray, "no reasonable jury could rely on this evidence to infer [color and national-origin] discrimination."  Id.  The Court will therefore grant the Government summary judgment as to the color and national-origin claims under Title VII related to Almutairi's March 2004 application.

Abuzaid, however, is not disabled, see Nassif Dep. at 73:22-74:1, so the Rehabilitation Act claim survives this initial test.  The question now becomes whether Almutairi can rebut Radio Sawa's qualifications-based explanation and show that a reasonable jury could find that the Government instead failed to hire Plaintiff because of his disability.

As courts do not "serve as a super-personnel department that reexamines an entity's business decisions," rebutting an employer's qualifications-based explanation often proves a

difficult task.  Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal quotation marks omitted).  Courts "assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone."  Aka, 156 F.3d at 1294.  "For this reason, a disparity in qualifications, standing alone, can support an inference of discrimination only when the qualifications gap is great enough to be inherently indicative of discrimination – that is, when the plaintiff is markedly more qualified . . . than the successful candidate."  Hamilton, 666 F.3d at 1352 (internal quotation marks omitted).

Here, however, the Court need not resolve the parties' clash over qualifications because there is other evidence far more indicative of discrimination.  The Circuit has "noted many times before that one way for a plaintiff to show that an adverse employment decision was made for a discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered for its decision was false."  Czekalski, 475 F.3d at 366 (internal quotation marks and brackets omitted).  Even apart from false explanations, moreover, "shifting and inconsistent justifications are probative of pretext."  Geleta v. Gray, 645 F.3d 408, 413 (D.C. Cir. 2011) (internal quotation marks omitted).  In addition, "independent evidence of discriminatory statements or attitudes on the part of the employer" can cast doubt on nondiscriminatory explanations.  Holcomb, 433 F.3d at 897.

Besides the qualifications-based explanation, Nassif gave another, more questionable basis for rejecting Almutairi's March 2004 application.  At a recent deposition, Nassif swore that two respected Yemeni journalists, Munir Mawari and Wadea Mansour, had questioned the veracity of Almutairi's resume and said Almutairi was a bad journalist.  See Nassif Dep. at 132:3-134:22, 139:5-141:5.  The fact that Nassif's new explanation emerged so late in the game

makes it dubious.  In its rejection letter, Radio Sawa told Almutairi that he was "among the best qualified applicants considered for the position."  Opp., Exh. 27 (Letter from Susan King to Nasser Almutairi (Mar. 25, 2004)).  And in a previous sworn statement, Nassif said Almutairi was not selected because his "professional broadcasting background was not as varied and broad" as Abuzaid's.  Nassif EEO Decl. at 4.  No mention was made of a fabricated resume.  Mansour, moreover, declared under oath that Nassif's testimony was "not true" and that he has "nothing but the highest respect for Mr. Almutairi," who Mansour believes is "honest and acts with integrity."  Mansour Decl., ¶¶ 3-4.  Almutairi has been unable to track down Mawari to verify his comments.  See Opp. at 40.

The Court, moreover, can also consider the shifting and false explanations that Radio Sawa gave for its almost-simultaneous rejection of Almutairi's June 2003 application.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) ("Nor does [Title VII] bar an employee from using the prior acts as background evidence in support of a timely claim.").  Radio Sawa's first story was that a policy prohibited relatives from working together, and the employment of Almutairi's son at the station therefore precluded Almutairi from employment there.  See Almutairi Decl., ¶ 16; Nasser Decl., ¶¶ 18, 21 ("Mr. Nassif explained to me that Voice of America policies prohibited MERN/Radio Sawa from hiring relatives to work in the same department or on the same shift."); Answer, ¶ 20 (admitting that "Mr. Nasser was informed by Mr. Nassif in relation to Plaintiff's application to work as a part-time contractor that it was the policy not to hire relatives to work together on the same shift, if the candidate was otherwise qualified").  No such policy existed, however.  See King Dep. at 47:11-18 ("[T]here is no prohibition to hire a family member, as long as the – the new person or the old person is not supervised by one another.").  Even though this explanation apparently came from Nassif, he

24

later admitted that this (imaginary) policy was "not a determining factor . . . [a]t all" in the decision not to hire Almutairi.  Nassif Dep. at 53:2-9.

Nassif subsequently explained that he had actually rejected the June 2003 application because he thought Almutairi overqualified for a technical POV job.  See Nassif Dep. at 57:5-19.  On this point, at least, Almutairi partially agrees.  See Opp. at 20 ("The Agency's assertion that Mr. Almutairi applied for a part-time Technical POV position defies common sense.  There would be no reason for Mr. Almutairi to apply as a 'part-time internet technician' when Mr. Nasser had encouraged him to apply as a full-time broadcaster, especially given Mr. Almutairi's credentials and experience.").  But even crediting that explanation, Nassif further testified that Nasser had agreed and recommended against hiring Almutairi.  See Nassif Dep. at 57:20-58:5.  Nasser contradicts that account in his sworn declaration.  See Nasser Decl., ¶¶ 16, 22 ("It remains my opinion that Mr. Almutairi should and would have been hired, but for Mr. Nassif's determination that Voice of America's anti-nepotism policy precluded it.").

As if this cascade of shifting and false justifications were not enough, Almutairi attests that after his interview, he heard Nassif tell Nasser, "'We don't need more people with disabilities here.'"  Almutairi Decl., ¶ 11.  Contrary to the Government's suggestion, it makes no difference that Nassif denied making the statement.  The jury, not the judge, determines who is telling the truth.  When heaped on top of the evidence for pretext that Almutairi has already provided, that discriminatory comment, tied directly to the decision not to hire, makes summary judgment inappropriate for the Rehabilitation Act claim related to the March 2004 application.

One final note: The Government also asks for summary judgment on the ground that Almutairi has shown no evidence of a disability.  Its request fails.  Almutairi can show a disability if a physical impairment substantially limits his walking and standing.  See 29 U.S.C.

§ 705(20)(B) (for purposes of 29 U.S.C. §§ 790-794f, "the term 'individual with a disability' means . . . any person who has a disability as defined in section 12102 of Title 42"); 42 U.S.C. § 12102(1) ("The term 'disability' means, with respect to an individual . . . a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ."); 42 U.S.C. § 12102(2)(A) ("For purposes of paragraph (1), major life activities include . . . walking [and] standing . . . .").  Almutairi's declaration details his problems walking and standing, including that he "walk[s] with a pronounced limp," that he "must use a leg brace or a cane to stand or walk," and that he "can only walk approximately five steps without assistance, after which [he] need[s] to stop and lean against something to rest."  Almutairi Decl., ¶ 2.  This would have been enough if Almutairi had stopped there.  Yet he went above and beyond, providing (under seal) medical reports and letters from doctors substantiating these problems. See Opp., Exh. 3.  Almutairi is obviously disabled under the Act.

IV.   **Conclusion**

For the aforementioned reasons, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  March 11, 2013